James W. JOHNSON, Jr. (No. 11752), Darrone J. Sampson (No. 11755), Fred L. Smith (No. 11765), and Gene E. George (No. 11832), Appellants,

v.

UNITED STATES, Appellee.

District of Columbia Court of Appeals.

Argued April 13, 1978.

Decided Jan. 31, 1979.

---

Robert P. Mosteller, Public Defender Service, Washington, D. C., for appellant Smith.

James R. Klimaski, Washington, D. C., appointed by this court, with whom David W. Brinkman, Washington, D. C., appointed by this court, was on the brief, for appellants Johnson and George.

Donald E. Cope, Washington, D. C., filed a brief for appellant Sampson.

Noel Anketell Kramer, Asst. U. S. Atty., Washington, D. C., with whom Earl J. Silbert, U. S. Atty., John A. Terry and Michael W. Farrell, Asst. U. S. Attys., Washington, D. C., were on the brief, for appellee.

Before NEWMAN, Chief Judge, and MACK and FERREN, Associate Judges.

NEWMAN, Chief Judge:

Appellants, seeking reversal of their convictions for kidnapping, robbery, sodomy, assault, and attempted murder, advance numerous claims of reversible error. Concluding that the trial court committed reversible error in denying appellants' motions for severance, we need not—and thus, do not—consider their other contentions with one exception.[1] In section I we set forth the relevant evidence and trial court proceedings. In section II we discuss the nature of those determinations committed to the trial court's discretion and reviewable for abuse of its exercise. In addition, we analyze the nature of an appellate court's review to determine whether the trial court's exercise of discretion was proper. In section III we discuss briefly the law concerning the severance of trials of jointly-charged defendants, and in section IV we apply the principles enunciated in sections II and III to the instant case. We reverse.

---

1. Appellants' other contentions jointly or severally challenge: various evidentiary rulings of the trial court; the extent to which the trial court permitted the government to use leading questions on direct examination; the sufficiency of the evidence on certain counts; the admissibility of certain tangible evidence; and the ruling of the trial court concerning merger of certain offenses. These points, we do not address. In addition, however, appellant Smith asserts the lack of a unanimous verdict by the jury. Since this issue is likely to recur on retrial, we discuss it in section V.

## I.

## A.

The evidence viewed in its light most favorable to the government, showed that on January 22, 1976, at about 5:30 p. m., Rene Fletcher received a phone call from Marshall Yancy asking her to come to his apartment to help his sister move. She agreed and arrived between 6:00 and 6:30. She had known Yancy and his roommate, Melvin Newton, (who was there when she arrived) for several months. Yancy told Fletcher that his sister would be there soon, and he left the apartment, purportedly to do some laundry. About ten minutes after Yancy returned, Darrone Sampson, Gene George, James Johnson, and Fred Smith arrived. Fletcher had known Sampson and Smith for about two years; she had seen the others several times in the previous few months. The group apparently believed that Fletcher knew the identity of several men who had robbed Johnson the night before, and they demanded that she reveal their names. When she failed to comply, they ordered her to take off her clothes. Feeling threatened, she did so.

Fletcher was forced into the bathroom where some of the appellants physically and sexually abused her. George pushed her head under water and then beat her across the face with a coat hanger. He suggested killing her with an overdose of drugs, but this idea was abandoned because no one had any drugs. Sampson cut her across the breast and thigh. She was forced to fellate Johnson who slapped her several times afterwards.

Fletcher was then allowed to dress. Sampson tied her hands, she was gagged, and a window in Yancy's fifth-floor apartment was opened. Sampson and another man took her to the open window and pushed her halfway out. When she screamed, she was brought back inside.

Appellants conferred among themselves for a time. When they finished, Sampson threw Fletcher her coat. When appellants were ready to leave the apartment, Fletcher asked that her personal property be returned, but she was told that her property now belonged to Johnson who was given three dollars of her money. Yancy and Newton remained in the apartment while the other four took Fletcher down the stairs to where Sampson's van was parked. They drove to 14th and U Streets to look for Johnson's robbers, but Fletcher failed to identify anyone. She was then driven to the southwest section of the city.

Sampson stopped the van at Haines Point and parked next to the Potomac River. The side door of the van was opened and Sampson kicked Fletcher in the face. Sampson and George dragged her from the van and, with her hands still tied behind her back, threw her over the railing into the water. The river was covered with a thin crust of ice. After some struggling she was able to free her hands, but she was unable to pull herself out because of the ice and the ache in her hands. More than half-an-hour later, around 10:00 p. m., she managed to attract the attention of some motorists who had stopped nearby.

## B.

On March 10, 1976, the six men were charged in a ten-count indictment with kidnapping while armed (D.C.Code 1973, §§ 22–2101, –3202); kidnapping (D.C.Code 1973, § 22–2101); armed robbery (D.C.Code 1973, §§ 22–2901, –3202); robbery (D.C.Code 1973, § 22–2901); assault with intent to kill while armed (D.C.Code 1973, §§ 22–501, –3202); assault with intent to kill (D.C.Code 1973, § 22–501); two counts of assault with a dangerous weapon (D.C.Code 1973, § 22–502); and sodomy (D.C.Code 1973, § 22–3502).[2]

Prior to the jury being selected, the trial court learned that Sampson allegedly had threatened his codefendant, Yancy. These threats were in anticipation that Yancy's testimony in his own defense would admit his presence at the apartment and would

---

**2.** Sampson, George, Johnson, and Smith were also charged with first-degree burglary, D.C. Code 1973, § 22–1801(a), but these charges were dismissed at the beginning of the trial.

place Sampson there, thus directly contradicting Sampson's alibi defense. The court conducted a hearing, concluded that such a threat had been made, and revoked Sampson's bond. All the appellants, except Sampson, thereupon moved for severance based on two grounds—conflicting defenses and manifest antagonism among appellants. The court denied these motions.[3] Part of the exchange between counsel and the court went as follows:

[COUNSEL]: Your Honor, I would like at this time to make a motion for severance on these grounds: Number one; there are—an apparent *Bruton* problem lies. I understand certain statements—

THE COURT: I understand the Government is not going to use the statements as part of its case in chief.

[COUNSEL]: Maybe they're not, but—

[ASSISTANT UNITED STATES ATTORNEY]: We're not going to use that. We've advised counsel.

THE COURT: All right.

[COUNSEL]: Number two; as I gather, two of the recipients of this threat may or may not testify, which would give conflicting defenses.

THE COURT: So—

[COUNSEL]: Well, which would clearly be, if there's a case justifying a severance—

THE COURT: No.

[COUNSEL]: —we ask where there is a situation, for example, "A" says he was there, comes in and constructs an alibi, and "B" says, "No, I wasn't there, I didn't see them." I think it's perfectly valid grounds at this time for a severance.

THE COURT: Denied.

[COUNSEL]: In addition, third ground: Clearly, in light of these allegations, there's going to be hostility between the defendants. I think, in the interest of justice, to provide my client with a fair trial—

THE COURT: I think justice dictates that they stay together.

[COUNSEL]: Well, my problem is this, Your Honor—

THE COURT: It may be your problem; it's not mine, . . .. Your motion is denied. It's on the record.

[COUNSEL]: May I just finish, sir?

THE COURT: No; I've heard enough.

[COUNSEL]: May I ask the Court this, then?

THE COURT: No; don't ask me questions. I just ruled.

[COUNSEL]: Well, what it's going to be—

THE COURT: [Counsel], it's going to be a difficult one. They could hate each other down there, but they'll all stand together and they'll all be tried together. Their problem as to whether they're going to take the stand or not is their situation.

After the jury was sworn and the government made its opening statement, Yancy's counsel made an opening statement. His defense, as outlined by counsel, was that although Yancy was present during the time of the commission of at least some of the offenses charged as were Fletcher, Newton, and "some other individuals," he was personally innocent of any crime. At the conclusion of that opening statement, a bench conference occurred during which all appellants joined in a motion for severance which was denied as to all of them. The following exchange between counsel and the court occurred:

[COUNSEL]: Your Honor, based on [counsel for Yancy's] statements of what his defense would be, I would move for a mistrial as to Mr. George and a severance because it's clearly apparent that you are going to have inconsistent defense. There's no way my client, Mr. George, can get a fair trial when [Yancy's] defense, in essence, makes him a second prosecutor against Mr. George when the statement clearly supports everything that the Government says.

---

**3.** Prior to trial, appellant Smith had filed a written motion seeking severance. This motion was also denied.

THE COURT: I suggest that's why you prosecute two people caught in the automobile at the same time. One hangs the other.

Denied.

The government presented its case, and at its close the court denied all motions for acquittal. At that point defendants Smith and Newton rested their cases.

Defendant Johnson offered an alibi defense involving himself, and defendants Sampson, George, and Smith. Defendants Sampson and George offered evidence consistent with this theory of defense. When Yancy took the stand defense counsel stated:

[COUNSEL]: Your Honor, just for the record, it's this witness' testimony that I think shows why all of us were requesting a severance—

THE COURT: And that's why they should be tried together, more than ever.

Yancy's account of the events was similar to that presented in the government's evidence, although he averred that his role in the general proceedings was minor and that he took no steps to inflict harm upon the victim. He also testified that when Sampson, Smith, George, and Johnson left the apartment with the victim there was no mention of taking her to the Potomac River.

The jury retired to deliberate on Friday, December 3, 1976. On Monday, December 6, the foreman sent a note saying that the jury was deadlocked on one defendant and one count. The jury was returned to the courtroom and verdicts of guilty on charges of kidnapping while armed, robbery, sodomy, assault with intent to kill while armed, and two counts of assault with a deadly weapon were returned against Sampson, Johnson, and George. Newton and Yancy were found not guilty. The court gave the jury an anti-deadlock charge pertaining to Smith. *See Winters v. United States*, D.C. App., 317 A.2d 530, 534 (1974). The next day Smith was found guilty of robbery, kidnapping, and assault with intent to kill and not guilty of all others except the sodomy charge on which the jury remained deadlocked. That charge was later dismissed by the government.

II.

Appellants contend that the trial court abused its discretion by denying their motions for severance. Resolving the issue in this case commences properly with an analysis of "discretion" as a legal concept.

A.

■ Discretion signifies choice. First, the decision-maker exercising discretion has the ability to choose from a range of permissible conclusions. The decision-making activity is not ministerial and the various elements of the problem do not preordain a single permissible conclusion. Rosenberg, *Judicial Discretion of the Trial Court, Viewed from Above*, 22 Syracuse L.Rev. 635, 636–37 (1971) [Rosenberg, *Judicial Discretion*]; Note, *Perfecting the Partnership: Structuring the Judicial Control of Administrative Determinations of Questions of Law*, 31 Vand.L.Rev. 91, 93–94 (1978) [Note, *Perfecting the Partnership*]. Second, the decision-maker can rely largely upon his own judgment in choosing among the alternatives. Although the act of choosing will be guided by various legal and other considerations, the decision-maker, and not the law, decides. Rosenberg, *Judicial Discretion, supra* at 636–37; Note, *Perfecting the Partnership, supra* at 93–94. In this sense, the core of "discretion" as a jurisprudential concept is the absence of a hard and fast rule that fixes the results produced under varying sets of facts. *Langnes v. Green*, 282 U.S. 531, 541, 51 S.Ct. 243, 75 L.Ed. 520 (1931).

■ The trial court nevertheless must choose wisely so that its judgment reflects "a discretion exercised not arbitrarily or willfully but with regard to what is right and equitable under the circumstances and the law, and directed by the reason and conscience of the judge to a just result." *Id.* This is to say neither that a determination committed to the trial court's discretion is freed from the restraints of fact and

the reasoned dictates of law nor that judgment and choice play no part in a trial court's determination of law and fact in a case. The one proposition is untenable; the other is unrealistic. As in its other decision-making activity, the court's substantial freedom of choice in an exercise of discretion must be tempered by rationality.

■■ The concept of "exercise of discretion" is a review-restraining one. The appellate court role in reviewing "the exercise of discretion" is supervisory in nature and deferential in attitude. *Cf. Ethyl Corp. v. EPA,* 176 U.S.App.D.C. 373, 405–09, 541 F.2d 1, 33–37, *cert. denied,* 426 U.S. 941, 96 S.Ct. 2663, 49 L.Ed.2d 394 (1976); *Greater Boston Television Corp. v. FCC,* 143 U.S. App.D.C. 383, 392–94, 444 F.2d 841, 850–52 (1970), *cert. denied,* 403 U.S. 925, 91 S.Ct. 2229, 29 L.Ed.2d 701, *reh. denied,* 404 U.S. 877, 92 S.Ct. 30, 30 L.Ed.2d 125 (1971).

> An area of trial court discretion is a pasture in which the trial judge can roam and graze freely rendering rulings his appellate betters might not have made, unless and until the higher court fences off a corner of the pasture by announcing that a rule of law covers the situation and has been violated. Until that occurs, the trial judge, wielding discretionary power, need not be right by appellate court lights in order to be upheld. Even if the appellate judges disagree with his call, they will defer to him. [Rosenberg, *Judicial Discretion, supra* at 650.]

Consequently, when the primary focus of the trial court's role shifts from the facts and law to the sound exercise of judgment, the appellate court, in its review capacity, does not render its own decision of what judgment is most wise under the circumstances presented. Rather, it examines the record and the trial court's determination for those indicia of rationality and fairness that will assure it that the trial court's action was proper.

Matters are committed to the discretion of the trial court and reviewed only for abuse of that discretion to reap the benefits of certain perspective and institutional advantages.

Several of the most important reasons for deferring to the trial judge's exercise of discretion [are] his observation of the witnesses, his superior opportunity to get "the feel of the case," *see Cone v. West Virginia Pulp & Paper Co.,* 330 U.S. 212, 67 S.Ct. 752, 91 L.Ed. 849 . . . (1947), and the impracticality of framing a rule of decision where many disparate factors must be weighed, *see Atchison, T. & S. F. Ry. v. Barrett,* 246 F.2d 846 (9 Cir. 1957) . . . . [*Noonan v. Cunard Steamship Co.,* 375 F.2d 69, 71 (2d Cir. 1967) (Friendly, J.).]

Many of these determinations arise during the course of a trial and relate to the manner in which the trial will proceed in that courtroom. Some deal more apparently with substantive matters in areas such as corrections, intra-family disputes, and equity. The problems may present individual fact patterns that are virtually unique or that are so novel that experience has not prescribed the dimensions of a workable rule. Rosenberg, *Judicial Discretion, supra* at 662–63. Particularized rules that attempt to distinguish quite similar cases on the basis of subtle differences or overbroad rules that cannot respond to those differences adequately may offer no acceptable solution. Instead, these determinations can be entrusted to the judgment of the trial court as guided by general principles indicating toward what end the decision-maker should aim in the given instance. The trial court's direct observation of the facts takes on a special significance since they are deemed inappropriate for the stricture of a rule. From "the superiority of the nether position," as Professor Rosenberg describes it, the trial court is capable of being influenced by much of what goes on in the hearing. Although these factors may not survive into the appellate record, they quite properly influence the evaluation of the case. *Id.* at 663–65. In determinations dependent upon facts and the interpretations of those facts the trial court's advantage is its immediacy.

The appellate court's deferential attitude also promotes the value of finality in the

initial determination. Knowing that the appellate court will not indulge in close scrutiny of the minutiae surrounding the trial court's exercise of judgment, parties to that determination may be less apt to seek to disturb it. *Id.* at 660–62. Thus the judicious employment of discretion can bring a definite termination and rest to a dispute that otherwise might continue to be contested in the appellate process. The advantages to the courts as an institution derived from preventing reargument of what is, in essence, an imprecise judgment matter also appear to justify committing those determinations to the trial court's discretion.[4]

## B.

The Supreme Court of Delaware, over a half century ago, defined "abuse of discretion":

> Abuse of discretion is a discretion exercised to an end or purpose not justified by and clearly against reason and evidence. It is abused where a court does not exercise a discretion in the sense of being discreet, circumspect, prudent and cautious. It is, in a legal sense, abused when the court exceeds the bounds of reason, all the circumstances before it being considered. An exercise of discretion may be erroneous but still be legal and free from abuse. Judicial discretion will not be reversed unless it appears that it was exercised on grounds, or for reasons, clearly untenable or to an extent clearly unreasonable. Judicial discretion does mean, and can mean, nothing else but exercising the best of the court's judgment upon the occasion that calls it forth. [*Bringhurst v. Harkins,* 2 W.W.Harr. 324, 331, 32 Del. 324, 331, 122 A. 783, 787 (1923).]

The components of the appellate court's review for abuse of discretion serve a dual purpose, for they not only act as measuring rods by which we may determine whether the trial court's action was proper, but, in their recital, they also indicate to the trial court the factors of which it should be aware in the course of its discretionary decision-making.

 First, we must ask *was the determination committed to the trial court's discretion.* For an appellate court to determine whether it should employ a deferential abuse of discretion regimen in review, it must know whether it is called upon to examine the trial court's exercise of judgment or its application of factual findings to a rule of law. In the greatest number of cases this question will be answered by inquiring whether this court, the rules of procedure, or the rules of law have identified the specific determination as one committed to the trial court's discretion. *See generally* Rosenberg, *Judicial Discretion, supra* at 653–60.

 Second, (a) *did the trial court recognize that it had this discretion,* and, if it did, (b) *did the trial court purport to exercise it.* Failure to exercise choice in a situation calling for choice is an abuse of discretion—whether the cause is ignorance of the right to exercise choice or mere intransigence—because it assumes the existence of a rule that admits of but one answer to the question presented. *See (Bradford) Brown v. United States,* D.C.App., 372 A.2d 557, 559, *cert. denied,* 434 U.S. 921, 98 S.Ct. 397, 54 L.Ed.2d 278 (1977). Similarly, when the trial court recognizes its right to exercise discretion but declines to do so, preferring instead to adhere to a uniform policy, it also errs. *Berryman v. United States,* D.C.App., 378 A.2d 1317, 1320 (1977); *Springs v. United States,* D.C.App., 311 A.2d 499, 501 (1972). If a particular determination has been liberated from the stricture of a hard and fast rule and committed to the trial court's discretion, the essence of the decision-making is the trial court's judgment in exercising that discretion. An outright failure or refusal to exercise that judgment is wholly defeating.

[W]here a party has called upon the court for a discretionary ruling, it is improper

4. *Cf.* Rosenberg, *Judicial Discretion, supra* at 660–61 (although Professor Rosenberg acknowledges these reasons, he considers them minor reasons because they do not aid in identifying which determinations ought to be committed to the trial court's discretion).

**364**

for the court to refuse to utilize its right to decide the question as a matter of discretion. Purporting to be bound to rule as a matter of law will not satisfy the moving party's claim on the court's discretion. [*Grow v. Wolcott,* 123 Vt. 490, 492, 194 A.2d 403, 404 (1963).]

▮▮▮ Third, *does the record reveal sufficient facts upon which the trial court's determination was based.* As we have noted, the determinations committed to the trial court's discretion are rational acts of decision-making. An informed choice among the alternatives requires that the trial court's determination be based upon and drawn from a firm factual foundation. Just as a trial court's action is an abuse of discretion if no valid reason is given or can be discerned for it, *Punch v. United States,* D.C.App., 377 A.2d 1353, 1359 (1977), *cert. denied,* 435 U.S. 955, 98 S.Ct. 1586, 55 L.Ed.2d 806 (1978), so also it is an abuse if the stated reasons do not rest upon a specific factual predicate. *Monroe v. United States,* D.C.App., 389 A.2d 811, 821 (1978). In many respects this test of the sufficiency of the record underlying a trial court's discretionary action is comparable to the "substantial evidence" test of the record in the judicial review of an administrative action. *See* D.C.Code 1978 Supp., § 1–1510(3)(E); 5 U.S.C. § 706(2)(E).[5] In both the judicial and administrative spheres the requirement that the decision-maker compile a record makes certain that the facts of the case do not escape his attention and makes it more probable that the decision-maker will exercise his discretion in a proper manner. *See*

Hahn, *Procedural Adequacy in Administrative Decisionmaking: A Unified Formulation,* 30 Ad.L.Rev. 467, 471–72 (1978). Further, the act of compiling and preserving a factual record enables the reviewing court to determine whether the decision-maker's choice was both reasonable and proper in the specific factual context. In the words of one court: "[T]he reasons for exercising discretion should not only be spelled out so a reviewing court can tell the basis of the Court's decision, but also so that counsel can know the basis of such decision." *Woodruff v. Woodruff,* 7 Ohio Misc. 87, 217 N.E.2d 264, 268 (1965) (emphasis omitted). The test of the record underlying the exercise of a trial court's discretion tends to vary somewhat with the nature of the issue to be decided. Generally the factual record must be capable of supporting the determination reached by the trial court. The facts may foreclose one or more of the options otherwise available to the trial court. Indeed, the facts may leave the trial court with but one option it may choose without abusing its discretion, all the others having been ruled out. *(Bradford) Brown v. United States, supra* at 561.

▮▮ It remains to be determined in each case whether the trial court should conduct an additional factual inquiry and upon what questions it should focus. A trial court's exercise of discretion on certain questions may require no factual inquiry into ancillary matters because the record of the trial proceeding and the attorney's offers of proof will be an adequate foundation.[6] By

5. An appellate court's review of an agency action differs from its review of a trial court's discretionary determination in the manner in which it probes the decision-maker's record. In reviewing an administrative action the substantial evidence test requires that a quantum of fact support the determination and that the conclusions relate rationally to that quantum. *Kopff v. District of Columbia Alcoholic Beverage Control Board,* D.C.App., 381 A.2d 1372, 1387 (1977).

6. *See generally Hughes v. Pender,* D.C.App., 391 A.2d 259, 262–63 (1978) (admission of expert testimony); *Forbes v. United States,* D.C. App., 390 A.2d 453, 459–60 (1978) (motion for new trial, verdict contrary to weight of evi-

dence); *Morris v. United States,* D.C.App., 389 A.2d 1346, 1352–53 (1978) (scope of cross-examination); *Hackney v. United States,* D.C. App., 389 A.2d 1336, 1344–46 (1978) (motion to sever trials); *Strickland v. United States,* D.C. App., 389 A.2d 1325, 1327–28 (1978) (motion for new trial, newly discovered evidence); *Blake Construction Co. v. Alliance Plumbing & Heating Co.,* D.C.App., 388 A.2d 1217, 1220 (1978) (leave to amend pleadings); *(Dexter) Brown v. United States,* D.C.App., 388 A.2d 451, 456–57 (1978); *Rink v. United States,* D.C.App., 388 A.2d 52, 57–58 (1978) (admission of prior consistent statement to show state of mind; denial of mistrial following prosecutor's improper question); *Jones v. United States,* D.C.App., 386

contrast, the trial court is often required to undertake a special factual inquiry and seek the answers to particular questions or raise questions about particular concerns prior to rendering a discretionary decision in certain areas. This additional step is a prerequisite to the court's exercise of discretion when the record of the trial proceeding otherwise will not reflect the factual foundations of the issues raised.[7]

▮▮▮ Fourth, *did the trial court exercise its discretion erroneously.* Answering this question requires the appellate court to make a number of inquiries. It must determine whether the trial court's action was within the range of permissible alternatives. The principles guiding the trial court's discretion will restrict the number of alternatives available. They may do so, for example, by stating what actions the trial court may take or enumerating the factors that the trial court may or should consider in its deliberation. Also, as discussed, the body of facts in the record may foreclose some or most of the options either as a matter of law or because the facts themselves are so extreme. Further, the appellate court should inquire whether the trial court's reasoning is substantial and supports the trial court's action. To exercise its judgment in a rational and informed manner the trial court should be apprised of all relevant factors pertaining to the pend-

ing decision. *United States v. Lewis,* 157 U.S.App.D.C. 43, 54, 482 F.2d 632, 643 (1973). The court reviewing the decision for an abuse of discretion must determine "whether the decision maker failed to consider a relevant factor, whether he relied upon an improper factor, and whether the reasons given reasonably support the conclusion." Note, *Perfecting the Partnership, supra* at 95. As Justice Frankfurter points out, "We must not invite the exercise of judicial impressionism. Discretion there may be, but 'methodized by analogy, disciplined by system.'" Cardozo, *The Nature of the Judicial Process,* 139, 141 (1921). Discretion without a criteria for its exercise is authorization of arbitrariness." *Brown v. Allen,* 344 U.S. 443, 496, 73 S.Ct. 397, 441, 97 L.Ed. 469 (1953).

▮▮▮ Determinations committed to the trial court's discretion do not submit themselves to a highly structured review for abuse of discretion as easily as do most administrative determinations. Administrative decisions typically are produced with such formality that the language of the decision provides a mechanism for evaluating it. The trial judge, ruling in the midst of trial, for example, is often confronted with situations that do not admit the amassing of a record and the enumeration of reasons upon which a structured review must depend.[8] Consequently, in reviewing

A.2d 308, 316 (1978) (weighing extent and impact of pretrial publicity); *Pynes v. United States,* D.C.App., 385 A.2d 772, 775–76 (1978) (jury instructions on credence to be given to particular evidence); *Montgomery v. United States,* D.C.App., 384 A.2d 655, 661–63 (1978) (sanctions for violation of rule of preservation of evidence).

7. *See generally Pollock v. Brown,* D.C.App., 395 A.2d 50 at 52–53 (1978) (sanction applied for failure to comply with civil discovery rules); *Johnson v. United States,* D.C.App., 391 A.2d 1383 (1978) (sentencing); *Gaither v. United States,* D.C.App., 391 A.2d 1364 (1978) (defendant's entitlement to psychiatric expert); *Moore v. Moore,* D.C.App., 391 A.2d 762, 770–72 (1978) (child custody and support); *Farrell v. United States,* D.C.App., 391 A.2d 755 (1978) (pretrial assertion of ineffective assistance of counsel); *Benvenuto v. Benvenuto,* D.C.App., 389 A.2d 795 (1978) (adjusting property rights incident to divorce); *Cotton v. United States,*

D.C.App., 388 A.2d 865, 869 (1978) (imposition of sanctions for bad faith discovery techniques); *Washington v. May Department Stores,* D.C.App., 388 A.2d 484, 485–86 (1978) (forum non conveniens); *Moore v. United States,* D.C.App., 387 A.2d 714, 715–16 (1978) (sentencing; conditions on the grant of probation); *Wright v. Wright,* D.C.App., 386 A.2d 1191, 1194 (1978) (rights of parties and minor children in divorce or separate maintenance proceeding); *Wiggins v. United States,* D.C. App., 386 A.2d 1171, 1174 (1978) (discoverability of certain information).

8. *See generally* Magruder, *The Trials and Tribulations of an Intermediate Appellate Court,* 44 Cornell L.Q. 1, 3 (1958):

As to trial judges, we must always bear in mind that they may be as good lawyers as we are or better. They are under the disadvantage of often having to make rulings off the cuff . . . in the press and urgency of a

a trial court's exercise of discretion, an appellate court should take cognizance of the nature of the determination being made and the context within which it was rendered. If needs be, it may examine the record and infer the reasoning upon which the trial court made its determination, *see Berryman v. United States, supra,* even though to do so in review of an agency's determination would constitute an unwarranted judicial usurpation of the administrative role. *See, e. g., Greater Boston Television Corp. v. FCC, supra* 143 U.S.App. D.C. at 392–94, 444 F.2d at 850–52.[9] Nonetheless, both the trial judge and trial counsel should take pains to ensure that the record does reflect both the foundations and the reasoning behind the discretionary decision.

■■■■ Fifth, we must ask, *having found error, is it of a magnitude to require reversal.* We will find reversible error and sacrifice the advantages attendant upon committing a determination to the discretion of the trial court where it is necessary to achieve a proper decision. Nonetheless, we are prepared to countenance imperfections in the trial court's exercise of discretion to enjoy more fully the advantages of making the determination discretionary.[10] Thus, at times we may find that the fact of

error in the trial court's determination caused no significant prejudice and hold, therefore, that reversal is not required. *See Napolitano v. Compania Sod Americana de Vapores,* 421 F.2d 382, 384 (2d Cir. 1970). In deciding whether the trial court's error warrants reversal, the appellate court must examine the totality of the circumstances, in the absence of factors indicating a different standard, *see, e. g., Springer v. United States,* D.C.App., 388 A.2d 846, 854–57 (1978), to determine whether a litigant was deprived of a meaningful determination.

■■■■ No hard and fast rule can indicate in each case whether reversal is appropriate. Although no list can hope to be exhaustive, we can enumerate some of the factors that might be relevant in deciding whether the trial court's error warrants reversal. If the error in the discretionary determination jeopardized the fairness of the proceeding as a whole, or if the error had a possibly substantial impact upon the outcome, the case should be reversed. *Tinsley v. United States,* D.C.App., 368 A.2d 531 (1976); *Koppal v. Travelers Indemnity Co.,* D.C.App., 297 A.2d 337, 339 (1972). Similarly, if the court failed to undertake a required factual inquiry or if it ignored an apparent deficiency in the record, reversal

trial. . . . Hence, we should approach our task of judicial review with a certain genuine humility.

9. This distinction in appellate court treatment of, on the one hand, an administrative agency's exercise of discretion and, on the other hand, the trial court's exercise of discretion is well-founded. The courts defer to an administrative agency's judgment because the legislature has delegated its own power of decision to the agency, not to the courts, and that delegation can be maintained as intended only if the courts respect the agency's exercise of discretion. Note, *Perfecting the Partnership, supra* at 123. Thus, in order not to substitute its judgment for the agency's, the court utilizes a highly structured mode of review that determines whether the agency's result is within its range of permissible alternatives and tests the solidity of the foundation from which the agency draws that decision. *See, e. g., Ethyl Corp. v. EPA, supra* 176 U.S.App.D.C. at 405–09, 541 F.2d at 33–37. When an appellate court reviews a trial court's exercise of discretion it can be either more intrusive or more restrained, as the occasion requires, because the decision is

committed initially for judicial, not administrative, action. The decision is committed to the trial court's discretion and the appellate court adopts a deferential attitude in review because of the advantages that accrue from dealing with that decision in this manner. Should that advantage be overborne by other considerations, however, the court need not be reticent to declare that a trial court's determination constitutes an erroneous exercise of discretion. *See Lindy Bros. Builders, Inc. v. American Radiator & Standard Sanitary Corp.,* 540 F.2d 102, 116 (3rd Cir. 1976).

10. Again this is a departure from the appellate review of administrative discretion where, if an error is found, the case is remanded to the agency out of hand, *see Jameson's Liquor, Inc. v. District of Columbia Alcoholic Beverage Control Board,* D.C.App., 384 A.2d 412, 418–21 (1978), unless the error is determined to be *de minimus, see Braniff Airways, Inc. v. CAB,* 126 U.S.App.D.C. 399, 411–12, 379 F.2d 453, 465–66 (1967).

is appropriate. *Pollock v. Brown,* D.C.App., 395 A.2d 50 (1978); *Moore v. Moore,* D.C. App., 391 A.2d 762, 770–72 (1978); *Farrell v. United States,* D.C.App., 391 A.2d 755 (1978). Even though the specific harm of the error might not be cognizable, the failure to inquire for the record deeply enough into the immediate problem suggests that the trial court did not exercise its judgment properly. For much the same reason reversal should follow if it is discerned that the trial court did not recognize its capacity to exercise discretion or did not purport to exercise it. *Berryman v. United States, supra; (Bradford) Brown v. United States, supra.* So, too, reversal may follow when the trial court purports to exercise discretion that it does not have. *Cf., Hall v. Watwood,* D.C.App., 289 A.2d 626 (1972). Further, if the trial court's decision is supported by improper reasons, reasons that are not founded in the record, or reasons which contravene the policies meant to guide the trial court's discretion or the purposes for which the determination was committed to the trial court's discretion, reversal likely is called for. *Gaither v. United States, supra.*

■ When the trial court's error is not so extreme as to require reversal by itself—as, for example, when the record is thin but not barren, or the reasoning is weak but not insubstantial—the reviewing court must weigh the severity of the error against the importance of the determination in the whole proceeding and the possibility for prejudice as a result. *See, e. g., Morris v. United States, supra* at 1352–53. The "right to be wrong without incurring reversal", Rosenberg, *Judicial Discretion, supra* at 637, is not absolute.

■ In sum, the appellate court makes two distinct classes of inquiries when reviewing a trial court's exercise of discretion. It must determine, first, whether the exercise of discretion was in error and, if so, whether the impact of that error requires reversal. It is when both these inquiries are answered in the affirmative that we hold that the trial court "abused" its discretion.

## III.

■ Under Rule 8(b) of the Criminal Rules of the Superior Court, defendants may be joined in indictment and trial if they are charged with crimes arising from the same act or transaction or series of acts or transactions. Under Super.Ct.Cr.R. 14, if a party is prejudiced by such joinder, "the court may order an election or separate trials of counts, grant severance of defendants or provide whatever other relief justice requires." The decision whether to grant a severance is committed to the discretion of the trial court and is reviewable by this court only for an abuse in its exercise. *Williams v. United States,* D.C.App., 382 A.2d 1, 8 (1978); *Clark v. United States,* D.C. App., 367 A.2d 158, 160 (1976) (per curiam); *Jackson v. United States,* D.C.App., 329 A.2d 782, 787 (1974), *cert. denied,* 423 U.S. 851, 96 S.Ct. 95, 46 L.Ed.2d 74 (1975). The motion to sever must be made "to allow the trial court to exercise its discretion to grant a severance," and to preserve the point for appeal. *Edwards v. United States,* D.C. App., 328 A.2d 90, 92 (1974) (footnote omitted).

■ A presumption favors the joinder of trial, *Baxter v. United States,* D.C. App., 352 A.2d 383, 385 (1976), because it

> expedites the administration of justice, reduces the congestion of trial dockets, conserves judicial time, lessens the burdens upon citizens who must sacrifice both time and money to serve upon juries, and avoids the necessity of recalling witnesses who would otherwise be called upon to testify only once. [*United States v. Robinson,* 139 U.S.App.D.C. 286, 289, 432 F.2d 1348, 1351 (1970), quoting *Parker v. United States,* 404 F.2d 1193, 1196 (9th Cir. 1968), *cert. denied,* 394 U.S. 1004, 89 S.Ct. 1602, 22 L.Ed.2d 782, *reh. denied,* 395 U.S. 941, 89 S.Ct. 2003, 23 L.Ed.2d 460 (1969).]

The trial court must exercise its discretion in balancing this "interest in judicial economy with the potential prejudice to any of the defendants." *United States v. Johnson,*

478 F.2d 1129, 1134 (5th Cir. 1973), quoting *United States v. Harris,* 458 F.2d 670, 673 (5th Cir.), *cert. denied,* 409 U.S. 888, 93 S.Ct. 195, 34 L.Ed.2d 145 (1972). One category of prejudice occurs when the defendants offer conflicting and irreconcilable defenses so that the jury "will unjustifiably infer that this conflict alone demonstrates that both are guilty." *Rhone v. United States,* 125 U.S.App.D.C. 47, 48, 365 F.2d 980, 981 (1966). "This requirement contemplates a clear and substantial contradiction between the respective defenses." *Williams v. United States, supra* at 8. The mere fact that "a defendant would have had a better chance of acquittal had he been tried alone" is not a sufficient indication of prejudice to maintain that a trial court abused its discretion by refusing to order severance. *Clark v. United States, supra* at 160.

## IV.

The record in this case tends to indicate that the trial court was aware that the grant or denial of the motions for severance was a matter committed to its sound discretion, that the court purported to exercise that discretion, and that sufficient facts appear of record to apprise the trial court of the facts relevant to such exercise. Thus we turn to the last two points of our analysis—was the exercise of discretion erroneous, and if so, is reversal mandated.

■■■ While joinder of trials is the norm, *Baxter v. United States, supra,* severance is proper "where the defendants present conflicting and irreconcilable defenses and there is a danger that the jury will unjustifiably infer that this conflict alone demonstrates that both are guilty." *Rhone v. United States, supra,* 125 U.S.App. D.C. at 48, 365 F.2d at 981. The trial court

in the case *sub judice* made clear its view that the fact of the irreconcilable defenses was no reason for granting a severance. As the trial court said most pungently in denying the severance motions made at the close of Yancy's opening statement: "I suggest that's why you prosecute two people caught in the automobile at the same time. One hangs the other." This rationale is manifestly contrary to that of such cases as *Rhone v. United States, supra.* Here the trial court was not merely ignoring one of the principles which should have guided its decision. Neither was the court merely giving the wrong reasons for its determination. Instead, the trial court effectively negated the guiding legal principles which constrained its discretionary choice. Having failed to apply the proper legal principles to its discretionary choice, the ruling of the court constituted error.[11]

■■■ In the circumstances of this case, where the fear which prompted the motion for severance—that the testimony of Yancy in his own defense would make him in essence a "star witness" for the government against these appellants—in fact transpired, coupled with the nature of the error itself (application of erroneous legal principles to guide discretionary choice), we conclude that the error of the trial court was of such a magnitude to require reversal.

## V.

■■■ Appellant Smith additionally contends that he was denied a unanimous verdict of guilt on the charge of assault with intent to kill because the trial judge instructed the jury improperly. One of the counts of the indictment charged all six defendants with assault with intent to kill.

11. The proper focus of the trial court's inquiry under *Rhone*—and of this courts on appeal—is the *danger* of the jury drawing an improper conclusion of guilt from the conflict of defense alone. The inquiry is not simply whether there is sufficient competent evidence to sustain the conviction. Conflicts in defendants' evidence occur after the government has rested. Thus, a condition precedent for the existence of a *Rhone* problem is the government having presented a sufficient case to sustain a convic-

tion, if obtained. Stated another way, the task of the court is in assessing *the risk* of the jury's being misled into finding guilt from the existence of the conflicting defenses alone. In this case, we need not decide the question—and thus express no view—of whether proper application of *Rhone* would have mandated granting the motions to sever. Given the acquittal of Yancy, this issue is not likely to arise at a retrial.

At trial the government explained that this charge was intended to encompass two separate incidents: the act of pushing Fletcher part of the way out of the window of Yancy's fifth floor apartment (the window incident) and the act of throwing her, with her hands bound, into the Potomac River (the river incident). Evidence was offered concerning both incidents, including evidence tending to show that the window incident was broken off, as suggested by the government's proof, when she screamed and her assailants feared she would be heard, or, as suggested by Yancy's testimony, because the defendants did not intend to kill her but only to scare her. Subsequently the trial judge instructed the jury that they could find defendants guilty of assault with intent to kill based upon either the window incident or the river incident or both.

> And although it applies to one charge here, there are two inciden[ts] the Government has given to you, the window and the river. If you find either/or, or both, it's satisfied. But there are two inciden[ts] here under one charge.

Appellants raised no objection at trial.

Appellant Smith argues that the trial court erred in ruling and instructing the jury that the separate incidents constituted a continuing offense because it permitted the jury to convict him without reaching a unanimous verdict within the meaning of Super.Ct.Cr.R. 31(a) and the Sixth Amendment to the United States Constitution. Under the court's instruction, appellant contends, some members of the jury may have voted to convict solely on the basis of the window incident and others solely on the basis of the river incident. Appellant contends that the two incidents were separate events and not parts of a common transaction or scheme as shown by the fact that the window incident was broken off for whatever reason and the river incident occurred after a time interval that contained several other criminal and noncriminal events. Appellant directs our attention to *United States v. Gipson,* 553 F.2d 453 (5th Cir. 1977), in which a conviction for interstate transportation of stolen automobiles,

18 U.S.C. § 2313 (1976), was reversed because the trial judge's instruction to the jury permitted them to convict if the defendant engaged in either "receiving, concealing, and storing" or "bartering, selling, and disposing." Stating that "[t]he unanimity rule thus requires jurors to be in substantial agreement as to just what a defendant did as a step preliminary to determining whether that defendant is guilty of the crime charged," *id.* at 457–58, the court found that the two groupings of activities prohibited by the statute were "sufficiently different so that a jury finding the actus reus element of the offense would not be 'unanimous' " if some jurors relied upon an activity within the first grouping while others believed his action fell only into the second. *Id.* at 458.

A similar problem arose in *Shelton v. United States,* 83 U.S.App.D.C. 32, 165 F.2d 241 (1947), when the prosecution of two separate perjured statements, under two separate provisions of the D.C.Code, was merged. After deciding that the original indictment was faulty, the court went on to say,

> We are constrained to point out that even if the indictment itself had been good, the judgment would have to be reversed, because, in view of the merger of the two counts, we cannot tell upon which false statement the jury rested the general verdict. [*Id.* at 36, 165 F.2d at 245.]

In most cases this concern with the unanimity of the verdict arises in the context of a contention that the original indictment was "duplicitous" and included more than one criminal act within a single count. The courts have stated that two of the reasons for rejecting duplicitous indictments are that "a general verdict of guilty does not disclose whether the jury found the defendant guilty of one crime or both" and that "there is no way of knowing . . . whether the jury was unanimous with respect to either." *United States v. Stark,* 515 F.2d 112, 116–17 (3d Cir. 1975); *United States v. Uco Oil Co.,* 546 F.2d 833, 835 (9th Cir. 1976), *cert. denied,* 430 U.S. 966, 97 S.Ct. 1646, 52 L.Ed.2d 357 (1977).

These principles apply with equal force to the issue presented in this case. The trial court's instructions to the jury permitted a conviction if some of the jurors were convinced beyond a reasonable doubt that the window incident constituted an assault with intent to kill while harboring reasonable doubts as to the river incident and if the remaining jurors were convinced beyond a reasonable doubt that the river incident constituted an assault with intent to kill while harboring reasonable doubts as to the window incident. The court should properly instruct the jury to prevent this from occurring.

*Reversed.*