Shawn BURGESS, Appellant,

v.

UNITED STATES, Appellee.

No. 05–CF–177.

District of Columbia Court of Appeals.

Argued Nov. 15, 2007.

Decided July 31, 2008.

Lee R. Goebes, Public Defender Service, with whom James Klein, Jaclyn S. Frankfurt, and M. Eve Hanan, Public Defender Service, were on the brief, for appellant.

Ann K.H. Simon, Assistant United States Attorney, with whom Jeffrey A.

Taylor, United States Attorney, and Roy W. McLeese III, and Lisa Hertzer Schertler, Assistant United States Attorneys, were on the brief, for appellee.

Before REID, Associate Judge, and FERREN and STEADMAN, Senior Judges.

REID, Associate Judge:

A jury convicted appellant, Shawn Burgess, on several counts of criminal offenses.[1] On appeal, his primary challenge [2] is to the decision of the trial court denying his motion *in limine* "to present expert testimony on the psychological factors of memory and perception that affect the accuracy of eyewitness identifications especially when it involves cross-racial identification." We hold that because Mr. Burgess failed to identify his expert witness, the expert's qualifications, and the particular opinions to be rendered (together with the bases for the opinions), the

trial court did not abuse its discretion in denying his motion.

## FACTUAL SUMMARY

The government presented evidence showing that on October 5, 2001, Mr. Burgess approached a group of Gonzaga High School students at Union Station. He asked the black students in the group whether two others, including Mr. Williams, were part of their group. The students responded that they were, and that Mr. Burgess should leave them alone. After Mr. Williams and the other non-black student had separated from the group, Mr. Burgess directed them into a secluded area. There, Mr. Burgess pressed an object against Mr. Williams' side and ordered the students to hand over their wallets. The students gave Mr. Burgess money from their wallets. Later, Mr. Burgess again approached Mr. Williams, directed him to the same secluded area,

1. Mr. Burgess was convicted of armed robbery of money and a watch from Christopher Williams, in violation of D.C.Code §§ 22–2901, –3202 (1981) (recodified at D.C.Code §§ 22–2801, –4502 (2001)); possession of a firearm during the commission of armed robbery of Mr. Williams, in violation of § 22–3204(b) (recodified at D.C.Code § 22–4504 (2001)); threats to do bodily harm to Mr. Williams, in violation of § 22–507 (recodified at D.C.Code § 22–407 (2001)); obstruction of justice, in violation of § 22–722(a)(3)(B); assault with intent to commit robbery of Miguel Rodriguez and Jan Hagen, in violation of § 22–501 (recodified at D.C.Code § 22–401 (2001)). The jury acquitted him on the count of robbery against Magee McIlvaine.

2. Mr. Burgess also complains that the trial court improperly denied his severance motion, and that the joinder of multiple robberies was prejudicial because the jury likely would cumulate the evidence, would not be able to keep the evidence of each incident separate and distinct, and would likely identify Mr. Burgess as the perpetrator of three similar robberies. "A motion for severance

on the ground of prejudicial joinder is committed to the sound discretion of the trial court." *Ifelowo v. United States,* 778 A.2d 285, 289 (D.C.2001) (quoting *Arnold v. United States,* 511 A.2d 399, 404 (D.C.1986) (internal quotation marks omitted)). We will reverse the trial court's denial of a motion to sever counts "only upon a clear showing of abuse of discretion." *Id.* (citations and internal quotation marks omitted). We generally require evidence concerning similar offenses to be kept separate and distinct. *Arnold, supra,* 511 A.2d at 404. The record before us shows that the government was careful to keep the evidence pertaining to each robbery incident separate and distinct, from the beginning to the end of Mr. Burgess' trial, and there was nothing complicated about each incident. And, the trial court's final instructions to the jury emphasized the separate and distinct nature of each of the robbery incidents. The jury's verdict reveals it was able to abide by the trial court's instructions, since Mr. Burgess was acquitted of the alleged McIlvaine robbery. In short, we see no clear abuse of discretion in the trial court's denial of Mr. Burgess' severance motion.

pressed a hard object into his back, and when Mr. Williams said he did not believe Mr. Burgess had a gun, the appellant pulled out a silver gun with a wooden handle, cocked it, pressed it against Mr. Williams' leg, and told the student that he was not afraid to shoot because he had "nothing to lose." He demanded the rest of Mr. Williams' money and his watch. After obtaining the money and watch, Mr. Burgess informed Mr. Williams that he knew he played basketball at Gonzaga, and that "he would come back and get [him] later if anything happened." Mr. Williams did not report the incident immediately, but subsequently told his father what had happened. And, two weeks after the incident, a Metropolitan Police Department ("MPD") detective showed Mr. Williams a photo array, and he selected a picture of Mr. Burgess as his assailant. He had described the man who robbed him as a black male in his late teens to early twenties, who was wearing a tan leather jacket tied around his waist, a white undershirt, and a skull cap.

On the evening of October 13, 2001, Mr. Burgess approached Mr. Rodriguez and Mr. Hagen while they were standing at the bottom of the escalator at the Eastern Market Metro station, waiting for a train. He began to talk with them about the September 11, 2001 events. With one hand in his bag, Mr. Burgess announced that he had a gun and asked Mr. Rodriguez and Mr. Hagen to reveal what they had in their pockets. Mr. Rodriguez expressed doubt that Mr. Burgess had a gun. Mr. Burgess said he would go a short distance away, "around the corner and switch it from the bag to his pocket." Mr. Burgess went behind a pillar, kept his eyes on Mr. Rodriguez and Mr. Hagen, zipped up his bag, placed it on his back and returned. Still doubting that Mr. Burgess had a gun, Mr. Rodriguez confronted him up close. Mr. Burgess "started to get a

little shaky," and when Mr. Rodriguez put his hand behind Mr. Burgess' back, the appellant "ran up the down escalator." Mr. Rodriguez alerted the guard at the metro station. Subsequently, Mr. Hagen and Mr. Rodriguez met separately with an MPD detective and each picked Mr. Burgess' picture out of a photo array. Mr. Rodriguez said he would "recognize [Mr. Burgess'] smirk anywhere."

## ANALYSIS

### *The Expert Testimony Issue: Cross–Racial Identification*

On October 8, 2004, prior to trial, Mr. Burgess filed a motion *in limine* "to present expert testimony on the psychological factors of memory and perception that affect the accuracy of eyewitness identifications especially when it involves cross-racial identification. . . ." In his motion, Mr. Burgess submitted the following "Proffer of Expert Testimony":

> The identification expert in this case will rely upon the results of numerous well-documented studies conducted by research psychologists to inform the jury of the effects that certain psychological factors present in this case have upon the ability of typical eyewitnesses to make accurate identifications. His testimony will cover the three stages of the memory process: acquisition, retention, and retrieval. He will discuss how factors present at each stage can affect the accuracy of eyewitnesses. Specifically, the expert will tell the jury that controlled experiments have led him and other leading experts in the field to draw the following general conclusions:
>
> A. A high level of stress and emotional arousal at the time of the eyewitness' observations makes the eyewitness less likely to retain an accurate memory and perception of

details of an event, including the physical appearance of the assailants.

B. Unusual details grab attention but detract from the witness' overall ability to perceive and maintain an image of the assailants.

C. Where there is a weapon present the attention of the witness is spent focused on the weapon and not on the assailants.

D. When a witness sets an image in [his/her] mind and expects the suspect to fit that image, the witness is likely to carry that image with [him/her] rather than the image of the true assailants.

E. Post-event information may get incorporated into the memory of the original event and have the effects of bolstering the witness' confidence in the identification.

F. Communication amongst multiple witnesses will tend to cause the witnesses to conform to the information from each other.

G. A witness will unconsciously transfer the image it received from identification procedures to in-court identification.

[H.]. A witness may over time become increasingly confident in the accuracy of his identification. The apparent growth in confidence may result from suggestions by others and authorities—either explicit or implicit—either proper or improper—that the defendant is in fact guilty. The apparent growth in confidence may result from actions by the suspect, such as flight. The apparent growth in confidence may result in the eyewitnesses's own desire to "get" someone for what happened. And the apparent growth in confidence may result from the "rehearsal effect"—the relaxation, ease and confidence that a witness feels as he repeats his story and begins to feel more comfortable with it. Regardless of the explanation for an eyewitness' apparent growth in confidence, that increased confidence has no correlation whatsoever to the likelihood that the eyewitness' identification is accurate.

[I]. Eyewitness confidence in his/her identification is virtually unrelated to the accuracy of the identification. Human beings are poor judges of the quality of their own perception and memory.

The government filed an opposition to Mr. Burgess' motion on October 15, 2004, stating in part: "The expert testimony proposed by the defense should not be admitted, where it is not 'beyond the ken' of the average juror, as jurors are aware of the impact factors such as stress, weapon focus, and cross-racial identifications may have on the accuracy of identification." The government also emphasized that Mr. Burgess had not identified his expert, nor presented any explanation for an expert witness' opinions, or the basis for the opinions.[3] Although defense counsel's written motion did not identify the full name of an expert, and did not reference the proposed

---

**3.** The government's opposition declared:

Although the government requested in its discovery letter to the defense dated August 13, 2004, information pertaining to any expert or scientific testimony or evidence pursuant to Rule 16(b)(1)(B) and (C), the government is not aware of any communi-cation by the defense that provides the identity of the[ ] proposed [defense] expert or his or her qualifications. Other than the instant motion, the government also is not aware of any communication by the defense that explains the witness's opinions or the bases for those opinions.

expert by name throughout most of the document, one sentence appeared toward the end of the text which appeared to suggest that the expert would be a Professor Fulero: "At a hearing on a motion to admit expert testimony, Professor Fulero will inform the Court of the many empirical studies that support his proffered testimony."

Subsequently, the trial court and counsel engaged in pre-trial discussion of the defense motion *in limine,* on October 20, 2004, during which counsel for Mr. Burgess referred to the proposed expert by gender (using "she" or "her"), but not by name. Defense counsel alleged the absence of physical evidence connecting Mr. Burgess with the armed robbery of the complainant, and emphasized that the only identification evidence presented by the government was that of witnesses who were not the same race as Mr. Burgess.[4] As the trial court and counsel for Mr. Burgess and the government were attempting to determine the latest case in this jurisdiction regarding expert testimony relating to eyewitness identification, de-

fense counsel suggested it "might be most helpful to both [herself] and the Court," if she were permitted to return to her office to retrieve the cases she had not brought to court. However, the trial judge interrupted her saying, "I am 99.8 percent certain that I'm going to deny your motion. Now if that's worth the walk, that's fine." Defense counsel inquired as to the basis for the proposed denial. The trial court essentially replied that eyewitness identification, including interracial identification, is not beyond the ken of the jury, and that the science in this subject area is not yet at a point where an expert could say that there is a 50% or a substantial error rate concerning these identifications.[5] The trial court further explained its position:

[The science is] getting to the point where . . . people will agree that a single eyewitness identification is simply inherently unreliable. They are not there. In fact, the opposite is true. The science is that a single eyewitness identification without more can be absolutely 100 percent reliable. . . . I remain in the position I've been in till now await-

---

4. Defense counsel asserted:
   [I]n this particular case there is no physical evidence besides the identification, which connects in any way Mr. Burgess to any of the charges. There is no gun, there is no backpack, there are no proceeds, no money, no watch. There is no videotape that anybody can point to, saying that Mr. Burgess did anything. What we have is just the sole identification of individuals. And what we also have, and in this particular case something extra, which is that the individuals who are complaining witnesses in this case are all of a different race from Mr. Burgess.

5. The trial court stated, in part:
   I don't think interracial identification, eyewitness identification, identification under stressful circumstances, such as a robbery or an assault, although there are weaknesses in such identification, I don't think it's beyond the ken of a jury to figure that out. They know that.

   Whether it's white people or black people or Asians and white people or black people, lots of people understand that when you are making an identification across racial lines, it's harder than within racial lines. People understand that when you are stressed, you think you know the person who did it, but you could be wrong. . . .

   [S]o my view is and has been for a long time that the science hasn't gotten there yet. I think it's going to get there because [of] all those DNA cases. . . . We all know our common experiences as jurors and people allow us to take into consideration that people can just be dead wrong. And if this is an ID case, you are free to argue all that. But is there science enough for an expert to come in and say the expertise in this field is that 50 percent of the time or a substantial part of the time, people are wrong? I just don't see it.

ing sufficient science to cause me to have serious doubt[,] to want to let the jury in on the science. And really, the issue is not reading the case law because all the case law is going to say the same thing until the science changes. It's going to say it's not error to exclude it. When the science changes and we get enough to say the jury ought to know what we just discovered, we discovered that there is a 60 percent chance, 40 percent chance of error in a single eyewitness identification where this and this and this are true. When we get there, that door is going to open, and all of us are going to let in eyewitness identification.

After explaining its position, the trial court asked defense counsel, "What does the science say? What do you think the science says? What will your expert testify to?" Defense counsel replied:

My expert will testify . . . that given certain factors, which are present in this case; for example, where either a weapon is displayed or implied, where the person is a stranger, has never been seen before by the complaining witness, . . . is of a different race, . . . there is a high probability that the identification of the . . . suspect by the complaining witness is faulty, given the circumstances and without any corroborating evidence.

After reviewing a then recent case from this court on eyewitness identification and expert testimony, the trial judge asked defense counsel whether she had "in [her] motion [a] proffer of the . . . expert, what the expert would say?" Defense counsel said, "No, Your Honor, not in my motion." The judge also wanted to know on what science the expert had based the earlier oral proffer provided by defense trial counsel, "[a]nd where is all that?" Defense counsel's *response* revealed (a) that no expert had yet been hired, although one had

been approached, and (b) the reasons for this strategy:

I'm sorry, Your Honor. I apologize. Let me explain to the [C]ourt very briefly what my position was. Because of the limited amount of funds that we have at Public Defender Service with regard to experts, even though I have contacted one and been in touch with her and shown her the discovery that I have in this case and know, in essence,— well, know basically what she will be testifying to, were the Court to grant my motion, I did not have her write an opinion or write a proffer because if the Court denies my motion—If the Court grants the motion, then that's fine, she can go ahead and . . . have a written proffer to the Court that I can turn over to [government counsel].

After informing defense counsel that she planned to pick a jury that afternoon, the trial court asserted:

So you are saving money? You can't do it like this. You just can't do it like this. You've got to go for broke. Spend the money and then if it's denied, the money is wasted, but you've got to do this right. You've got to say in your motion this is what my expert would say; this is the science upon which she relies, this study, that study. . . .

In response to defense counsel's contention that the identification of Mr. Burgess by the eyewitnesses was equivocal, the trial court reviewed the words used by the complaining witnesses. In addition, the trial court expounded on the necessity of a detailed proffer:

The science is moving towards a place where it will say unequivocally, or the general consensus will be that these kinds of identifications cannot be the basis for convictions any more. And I see it coming, but I don't know that we are there yet. And in order to conclude

that we are there[,] because I'm not watching the science, I'm not reading those trade journals, you've got to submit the science in these kinds of motions.

Even if you had gone across the street to get your materials, you would have to bring back what the expert says the last study was or the most important study was or something that would convince me that on these facts, where you've got what you call equivocal identification, one of which is equivocal—I think that's him—and you get references to the smile or the smirk to his eyes, which seem to be positive identification but nonetheless cross-racial between strangers. If something is changed in the science, in cross-racial stranger identifications, I'm happy to see it. But then you've got to give the government an opportunity to call their experts and say, no, that science is no good at all. So, I'm inclined—I wasn't inclined to grant it, anyway.... I think we're too far down the road to let you go get your science from the expert and submit it, then delay so that the government can respond to it and then rule because we would be weeks away, maybe even longer. Maybe even a month away, unless the government already has an expert that they use. They would have to look at your science and react to it. So it seems to me the motion *in limine* has to be denied partly because I don't "think" the science is there yet, but more importantly because you haven't demonstrated that the science is there.

Mr. Burgess contends that the trial court abused its discretion when it excluded "defense-proffered expert testimony on the factors that influence an eyewitness' ability to make accurate identifications." He complains that instead of exercising

its discretion, the trial court "appeared to apply a categorical rule that the expert evidence ... would be excluded ... until ... [this court] reversed a trial court's ruling excluding expert testimony on this topic." He claims the trial court erred by "suggest[ing] that the factors that affect the accuracy of eyewitness identifications are within the ken of the average juror," and the court "erroneously concluded that expert testimony on eyewitness identifications should be excluded unless the experiments revealed that eyewitness identifications were 'inherently unreliable,' just as polygraphs have been found to be unreliable." Furthermore, Mr. Burgess argues that the trial court committed reversible error by denying him his right to a "meaningful opportunity to present a complete defense," in that "the government presented no evidence to corroborate the identifications and expert testimony on the specific factors affecting the accuracy of eyewitness identifications was crucial to meeting the persuasive force of the numerous cross-racial stranger identifications." The government retorts that it was "unnecessary for the trial court to exercise its discretion on the merits of" Mr. Burgess' motion because he "did not identify a proposed expert, nor did he describe the opinions he expected his expert to offer." Therefore, the government argues, "under well-established legal principles, he failed to lay the requisite foundation for a determination of whether the testimony he sought to adduce was admissible."

Our standard of review governing the admission or exclusion of expert testimony and the trial court's broad discretion is well known. We will sustain the trial court's decision to admit or exclude such evidence unless it is "manifestly erro-

neous."[6] Because "the defense should be free to introduce appropriate expert testimony, ... such evidence should be admitted if the opinion offered will be likely to aid the [jury or the trial court] in the search for truth."[7] However, since "expert or scientific testimony possesses an aura of special reliability and trustworthiness, the proffer of such testimony must be carefully scrutinized."[8] In conducting its scrutiny of the proffer, the trial court "must take no shortcuts; it must exercise its discretion with reference to *all* the necessary criteria[;] [o]therwise, the very reason for [our] deference [to the trial court's ruling]—*i.e.*, the trial court's opportunity to observe, hear, and otherwise evaluate the witness—will be compromised."[9]

The trial court's scrutiny of the proffer and its decision regarding the admissibility of expert testimony, is guided by the test articulated in *Dyas, supra,* a case which concerned the proffered testimony of an expert witness on eyewitness identification. We reiterated that test in *Ibn–Tamas, supra:*

(1) the subject matter "must be so distinctively related to some science, profession, business or occupation as to be beyond the ken of the average layman";
(2) "the witness must have sufficient skill, knowledge, or experience in that field or calling as to make it appear that his opinion or inference will probably aid

the trier in his search for truth"; and (3) expert testimony is inadmissible if "the state of the pertinent art or scientific knowledge does not permit a reasonable opinion to be asserted even by an expert."[10]

The party proffering the expert witness must satisfy all three components of the test.

While the trial court's comments during its colloquy with counsel ranged widely, they can be interpreted to mean that, in the trial judge's view, Mr. Burgess failed to satisfy any part of the *Dyas* three-fold test. We need not consider whether the trial court was correct in apparently deciding that appellant did not meet his burden with respect to the first and third factors of the test because, as to the second factor concerning the qualifications of the expert, Mr. Burgess' failure to identify an expert witness is fatal.

■ Mr. Burgess' written motion *in limine* refers to an expert of the male gender ("he," "his"), and towards the end of his motion, there is a reference to a "Professor Fulero." Yet, during the oral discussion with the trial court, defense counsel used the pronoun, "she," in referencing the expert, but counsel did not mention a specific female name; nor did she invoke the name of Professor Fulero as the defense expert. And, during the oral discussion, defense counsel offered no background information about the fe-

. *Evans–Reid v. District of Columbia,* 930 A.2d 930, 935 (D.C.2007) (citing *Dyas v. United States,* 376 A.2d 827, 831 (D.C.1977) (other citation omitted)); *Hager v. United States,* 856 A.2d 1143, 1147 (D.C.2004) (citations omitted); *Green v. United States,* 718 A.2d 1042, 1050 (D.C.1998); *Ibn–Tamas v. United States,* 407 A.2d 626, 632 (D.C.1979) (citations omitted).

. *Ibn–Tamas, supra,* note 6, 407 A.2d at 632 (citations and internal quotation marks omitted).

. *Id.* (citation and internal quotation marks omitted).

. *Id.* at 635 (quoting *Johnson v. United States,* 398 A.2d 354, 363–67 (D.C.1979)).

. *Id.* at 632–33 (quoting *Dyas, supra,* note 6, 376 A.2d at 832) (quoting McCormick on Evidence § 13 (2d ed. E. Cleary 1972) (emphasis omitted)).

male defense expert. Thus, the trial judge had virtually no useful information regarding the proposed expert. Without a definite expert, the expert's qualifications and field of study, and the opinions to be rendered, the trial court could not determine whether the expert had "sufficient skill, knowledge, or experience in that field"—here, the study of eyewitness identification and especially cross-racial identification—to aid the jury or the trial court. As we have said previously, "the expert's credentials must be sufficient for the type of psychological testimony proffered."[11] On this record, we are constrained to hold that because the defendant, Mr. Burgess, failed to identify his expert witness, the expert's qualifications, and the particular opinions to be ren-

dered (together with the bases for the opinions), the trial court did not abuse its discretion in denying Mr. Burgess' motion *in limine* to present expert testimony pertaining to psychological factors that affect the accuracy of eyewitness identification, especially cross-racial identification. *Hager, supra,* note 6; *Ibn–Tamas, supra,* note 6; *Dyas, supra,* note 6.[12]

Accordingly, for the foregoing reasons, we affirm the trial court's judgment of conviction.

*So ordered.*

**11.** *Ibn–Tamas, supra,* note 6, 407 A.2d at 637.

**12.** We emphasize that our holding is limited to the insufficiency of Mr. Burgess' proffer with respect to the second *Dyas* factor. We do not determine whether the proffer was sufficient with respect to the first and third *Dyas* factors, or whether the trial court abused its discretion in ruling that Mr. Burgess' proffer was insufficient as to those factors. Given some of the comments of the trial court, however, we take this opportunity first to reiterate what we said in *Ibn–Tamas* regarding the third *Dyas* factor concerning the state of the scientific knowledge:

> It is true that the state of scientific knowledge itself can be so meager in a particular field of study that courts will preclude reliance on expert testimony about it, ... but such instances merely reflect the court's conclusion that no reliable methodology for making the inquiry has been discovered.... Basically, therefore, the third test deals with the "state of the art" of inquiry, not with the quantity of substantive knowledge.
> In summary, satisfaction of the third *Dyas* criterion begins—and ends—with a determination of whether there is general acceptance of a particular scientific methodology, not an acceptance, beyond that, of particular study results based on that methodology.

*Id.* at 638 (citations omitted). Second, trial judges should be cognizant that the art of inquiry or the scientific methodology govern-

ing the psychological study of eyewitness identification, including cross-racial identification, and also pertinent case law in other jurisdictions, reflect new developments since our 1977 *Dyas* decision, and hence, the first *Dyas* factor may require more than cursory scrutiny today. *See, for example,* Jody E. Frampton, *"Case Note & Comment: Can a Jury Believe My Eyes, and Should Courts Let Experts Tell Them Why Not: The Admissibility of Expert Testimony on Cross–Racial Eyewitness Identification in New York After People v. Young,"* 27 Pace L.Rev. 433 (2007); Jules Epstein, *"The Great Engine That Couldn't: Science, Mistaken Identifications, and the Limits of Cross–Examination,"* 36 Stetson L.Rev. 727 (2007); Sandra Guerra Thompson, *"Beyond a Reasonable Doubt? Reconsidering Uncorroborated Eyewitness Identification Testimony,"* 41 U.C. Davis L.Rev. 1487 (2008); Radha Natarajan, *"Note: Racialized Memory and Reliability: Due Process Applied To Cross–Racial Eyewitness Identifications,"* 78 N.Y.U.L.Rev. 1821 (2003); *People v. LeGrand,* 8 N.Y.3d 449, 835 N.Y.S.2d 523, 867 N.E.2d 374 (2007); *Ferensic v. Birkett,* 501 F.3d 469 (6th Cir.2007); *Brodes v. Georgia,* 279 Ga. 435, 614 S.E.2d 766 (2005). It is clear, of course, that *Dyas* should not be read to exclude any expert testimony on eyewitness definitions. *See Green, supra,* note 6, 718 A.2d at 1050–51.