Myron F. JACOBS, Appellant,

v.

UNITED STATES, Appellee.

No. 12837.

District of Columbia Court of Appeals.

Argued Sept. 7, 1978.

Decided Feb. 21, 1979.

Henry W. Asbill, Public Defender Service, for appellant.

Paula J. Page, Asst. U. S. Atty., Washington, D. C., with whom Earl J. Silbert, U. S. Atty., John A. Terry, Donald L. Golden, and Michael W. Farrell, Asst. U. S. Attys., Washington, D. C., were on brief, for appellee.

Before NEWMAN, Chief Judge, and KERN and HARRIS, Associate Judges.

NEWMAN, Chief Judge:

In this case, we are called upon to determine whether the trial court abused its discretion in revoking appellant's probation one year after he had been committed by another judge of the Superior Court under Title II of the Narcotic Addicts Rehabilitation Act of 1966, codified as amended at 18 U.S.C. §§ 4251–4255 (1976) (NARA), for two misdemeanors committed while on probation. To resolve this question, we must consider the relationship of NARA, the provisions of D.C.Code 1973, § 24–104, governing probation revocation, and the principles governing the proper exercise of discretion. Concluding that the trial court abused its discretion, we reverse.

The record reveals that on December 12, 1975, Judge Burka sentenced appellant to forty months to ten years imprisonment after he pleaded guilty to the crimes of forgery, receiving stolen property, and simple assault. Execution of the sentence was suspended, and appellant was placed on five years probation on condition that he enter and complete the Regional Addiction Prevention, Inc. (RAP) drug treatment program. Shortly after commencing this program, appellant absconded from the RAP facility and was arrested on January 12, 1976, for two misdemeanor violations—receiving stolen property and petit larceny. Later that day, the Bail Agency attempted to contact the probation officer originally assigned to appellant's case, and when the officer was not available, informed that department of appellant's rearrest. Appointed counsel, also on the same day, January 12, 1976, called Judge Burka's chambers leaving a message that appellant had been arrested.

On January 28, 1976, the United States filed a motion seeking a revocation of appellant's probation. The motion stated that the appellant had absconded from RAP and had been arrested on new charges. On February 9, 1976, counsel spoke with Judge Burka's chambers and was informed that the Judge had the court jacket and had taken the case under advisement. On March 9, 1976, a revocation hearing was scheduled but not held apparently because counsel for the government desired to coordinate the disposition of both the new case and the probation revocation hearing with the view toward a NARA disposition. On March 10, 1976, appellant's counsel on the new charges was informed that the government would not oppose a NARA sentence. Thereafter, on March 22, 1976, the appellant pleaded guilty to the two misdemeanor counts and was immediately sent to the federal facility in Danbury, Connecticut, for a preliminary NARA study which required a determination that the appellant is, in fact, an addict with a strong likelihood of rehabilitation and that a facility is available in which to treat him.

On April 13, 1976, appellant's counsel on the probation revocation motion received a telephone call from Judge Burka's chambers advising her that the Judge wanted to schedule a revocation hearing. At that time the Judge's chambers was informed that appellant was at Danbury pursuant to Judge Neilson's March 22 order, and there was agreement that a new hearing date would be set after the study was completed. May 11, 1976, was the date set for this hearing and again it was not held. On May 17, 1976, appellant's sentencing before Judge Neilson was continued until June 15,

1976, and then to June 21, 1976, to allow for the completion of the NARA study. On June 21, 1976, Judge Neilson committed appellant to NARA custody on the recommendation of the NARA report, without objection by the government or Judge Burka, for an indeterminate period not to exceed two years. On October 14, 1976, appellant's counsel informed Judge Burka's chambers of this disposition and that appellant was in the NARA facility in Lexington, Kentucky.

On June 21, 1977, a year and a half after appellant's arrest on new charges and exactly one year after appellant was sentenced, the probation department filed a report with Judge Burka outlining appellant's alleged violations of probation. The report stated that appellant had left RAP on December 15, 1975, and had not informed the probation officer of his whereabouts.[1] Pursuant to this report, Judge Burka issued a bench warrant for appellant. On July 13, 1977, the NARA officials decided that appellant should be released to a halfway house as part of the aftercare portion of the NARA commitment, but the bench warrant was lodged on August 16, 1977, and served as a detainer. Appellant was returned to Washington, and after several unexplained continuances, was finally afforded a revocation hearing on October 27, 1977. At this hearing probation was revoked. Part of the report dated September 1, 1977, from appellant's case manager at the NARA facility, was read into the record at the hearing. It reflected that appellant was an asset to the manager and the unit in general. The report states

> his outlook is now pretty good, realizes his mistakes he made in life, and since being incarcerated is ready to go out in society and assume his place of responsibility as an upstanding citizen. I strongly feel [appellant] can contribute to the

social environment and be a true asset to the outside world. I recommend that [he] be given the opportunity to prove his worth to society.

Notwithstanding this recommendation, appellant was ordered to serve an amended sentence whereby the two misdemeanor terms were made to run concurrently with that originally imposed for the felony. Appellant was incarcerated in Lorton. A Motion for Reconsideration was filed and on February 13, 1978, was denied. Appellant was subsequently paroled from Lorton in April 1978.

## I

NARA seeks to treat "those addict offenders whose criminal offenses are secondary to what may be described as the acute illness of addiction when it is reasonably clear that these individuals are amendable to treatment. H.R.Rep.No. 1486, 89th Cong., 2d Sess. 13, *reprinted in* [1966] U.S. Code Cong. & Admin.News, pp. 4245, 4254. Thus, NARA is a federal scheme for rehabilitation of addicts who resort to crime to support their addiction.[2] Title II of NARA provides that the court may place in the custody of the Attorney General for examination an "eligible" convicted offender believed to be an addict. 18 U.S.C. § 4252 (1976). An "eligible offender" is "any individual who is convicted of an offense against the United States, but does not include—(3) an offender . . . who is on probation . . . : *Provided,* That an offender on probation . . . shall be included if the authority authorized to require his return to custody consents to his commitment." 18 U.S.C. § 4251(f)(3) (1976). After examination, if the offender is found to be addicted and treatable, if appropriate facilities are available, and if the court concurs,[3] § 4253(a) says that the court "shall commit him" for treatment.

---

1. Apparently the probation officer had not become aware, in all that time, of the appellant's rearrest and sentencing.

2. A basic purpose of the bill "is to provide a practical and expeditious procedure to break a pattern of addiction and criminality." H.R.

Rep.No. 1486, *supra* at 11 [1966], U.S.Code Cong. & Admin.News at 4252.

3. It is within the court's discretion to either accept or reject the NARA determination. *See Wilmore v. United States,* 565 F.2d 269 (3d Cir. 1977); *United States v. Arellanes,* 503 F.2d 808

Congress was concerned that hardened criminals would receive care under the Act, but the strict rules of eligibility allow the court to temper rigid criminal concepts of punishment through sentencing with a new flexibility in dealing with addicted offenders.[4] Once committed, the authority over the offender is within NARA and not the court. This authority continues over the offender throughout his treatment under NARA. 18 U.S.C. § 4251(c) (1976) defines treatment as including,

confinement and treatment in an institution and under supervised aftercare in the community and includes, but is not limited to, medical, educational, social, psychological, and vocational services, corrective and preventive guidance and training, and other rehabilitative services designed to protect the public and benefit the addict by eliminating his dependence on addicting drugs, or by controlling his dependence, and his susceptibility to addiction.

The legislation also provides for firm control over the addict throughout all phases of the sentence, including the conditional release (aftercare) portion of the program. 18 U.S.C. § 4255 (1976).[5] Congress did not take aftercare lightly which is evidenced by specifically requiring the addict to remain under the authority of NARA throughout this period. Congress felt that strong control during aftercare was extremely necessary and made it an integral part of the treatment because the

addict must be given the support he needs in order to aid him to withstand the problems of his local environment. He

must be given assistance and support so he can become a person who can cope with the problem of drug addiction. Further, the bill insures that the supervisory authority will exercise its control over the addicted individual for a sufficient period of time to give reasonable hope for his true rehabilitation. [H.R.Rep.No. 1486, *supra* at 14, [1966] U.S.Code Cong. & Admin.News at 4255.]

The stage was thus set for an addict to be rehabilitated through treatment and supervision.

█ District of Columbia Code 1973, § 24–104, gives the trial court the power to revoke probation.[6] That probation statute is drawn broadly to give the court great leeway and flexibility to tailor the decision on probation to each probationer's needs. This power to revoke probation must be exercised by "informed discretion based upon a hearing in accordance with due process requirements, *Gagnon v. Scarpelli,* 411 U.S. 778, 93 S.Ct. 1756, 36 L.Ed.2d 656 (1973) . . . . [T]he fact remains that once granted, probation does not become a vested right. It is granted in the sound exercise of discretion and so may it be revoked." *Wright v. United States,* D.C. App., 315 A.2d 839, 841 (1974). *See, e. g., Sanker v. United States,* D.C.App., 374 A.2d 304, 310 (1977).

█ Thus, revocation of probation is within the trial court's discretion when the probationer, "commit[s] offenses of such nature as to demonstrate to the Court that he is unworthy of probation and that the

---

(9th Cir. 1974); *United States v. Williams,* 157 U.S.App.D.C. 355, 484 F.2d 835 (1973).

**4.** The House Report states:

[T]he bill provides alternatives which provide a needed flexibility in the law. The practical effect of the implementation of the law provided for in the bill, is that strict punishment can be meted out where required to the hardened criminal, while justice can be tempered with judgment and fairness in those cases where it is to the best interest of society and the individual that such a course be followed. [H.R.Rep.No. 1468, *supra* at 9, [1966] U.S. Code Cong. & Admin.News, *supra* at 4250.

*See Watson v. United States,* 133 U.S.App. D.C. 87, 90, 408 F.2d 1290, 1293 (1969).]

**5.** 18 U.S.C. § 4255 (1976) in pertinent part states, "An offender who has been conditionally released shall be under the jurisdiction of the Board as if on parole under the established rules of the Board and shall remain, while conditionally released, in the legal custody of the Attorney General."

**6.** D.C.Code 1973, § 24–104, states in part, "At any time during the probationary term the court . . . may revoke the order of probation and cause the rearrest of the probationer . . . ."

granting of same would not be in subservience of the ends of justice and the best interests of the public, or the [probationer] . . . ." *Short v. United States,* D.C. App., 366 A.2d 781, 786 (1976), quoting *Wright v. United States,* supra at 841, quoting *James v. United States,* 140 F.2d 392, 394 (5th Cir. 1944).

> The question remaining is,
> whether there has been an abuse of discretion, and [that issue] is to be determined in accordance with familiar principles governing the exercise of judicial discretion. That exercise implies conscientious judgment, not arbitrary action. It takes account of law and the particular circumstances of the case and "is directed by the reason and conscience of the judge to a just result." While probation is a matter of grace, the probationer is entitled to fair treatment, and is not to be made the victim of whim or caprice. (*Burns v. United States,* 287 U.S. 216, 222–23, 53 S.Ct. 154, 156, 77 L.Ed. 266 (1932) (citations omitted).]⁷

Justice Frankfurter, speaking for the Court on the issue of abuse of discretion in *Brown v. Allen,* 344 U.S. 443, 496, 73 S.Ct. 437, 441, 97 L.Ed. 469 (1953), wrote, "[d]iscretion without a criterion for its exercise is authorization of arbitrariness." Most assuredly there must be "room for assessing facts and balancing conflicting considerations of public interest," *id.,* but "[t]he hallmark of a proper exercise of discretion is principled, albeit flexible, choice." *Punch v. United States,* D.C.App., 377 A.2d 1353, 1359 (1977). *See generally Johnson v. United States,* D.C.App., 398 A.2d 354 (1979).

We have described our review of the exercise of discretion thusly:

> In sum, the appellate court makes two distinct classes of inquiries when reviewing a trial court's exercise of discretion. It must determine, first, whether the exercise of discretion was in error and, if so, whether the impact of that error requires reversal. It is when both these inquiries

are answered in the affirmative that we hold that the trial court "abused" its discretion. [Id. at 367.]

It is to this analysis that we now turn.

## II

■ Although Judge Burka was fully informed of appellant's probation violations in January 1976, of the NARA study in April 1976, and of the NARA commitment in October 1976, he took no action to revoke probation until August 1977, when the bench warrant was issued. Then, in October 1977, after appellant had undergone NARA treatment for some sixteen months, Judge Burka revoked appellant's probation and ordered the execution of his original sentence. This action came after the Judge was made aware of the NARA report which had recommended not only that appellant be returned to the community, but determined that he would be an asset to that community. By revoking probation, the appellant was incarcerated in Lorton, denying him further treatment under NARA, after nearly a year and a half of sustained progress. This incarceration thwarted the very purposes underlying not only the Act but the sentence already served by appellant, and short-circuited the control given to the NARA officials as envisioned by Congress. The justification in January 1976 to revoke probation was simply not present in September 1977 after such an extensive delay and the subsequent NARA commitment, with the very purposes of that commitment being served.

Even after a full hearing which supposedly formed the basis of Judge Burka's "informed discretion," *Wright v. United States, supra* at 841, such a revocation takes on the appearance of an abuse of the trial court's power. There was no evidence in September 1977 that the appellant was "unworthy of probation," *James v. United States, supra* at 394, or that the revocation would be "in subservience of the ends of

---

7. *See Stevens v. District of Columbia,* D.C. Mun.App., 127 A.2d 147, 148–49 (1956); *Manos v. Fickenscher,* D.C.Mun.App., 62 A.2d 791, 792 (1948); *Basile v. United States,* D.C.Mun.App., 38 A.2d 620, 622 (1944).

justice and [in] the best interests of the public, or the [probationer] . . . ." *Id.* There was no principled basis for the revocation hearing to have been delayed for so long a period.[8] Considering all of the circumstances, we hold that the trial judge abused his discretion by revoking probation.

Although Judge Burka gave appellant credit for time served under NARA, revocation of his probation dissipated the benefits gained from his participation in NARA, due to the subsequent incarceration at Lorton. When appellant was then paroled in April 1978, he was deprived of the continuing therapeutic advantages of supervision by NARA parole officers. In addition, the NARA authorities were ready to parole appellant in July 1977 before Judge Burka revoked probation. As a consequence of the revocation and appellant's return to Lorton, a different Parole Commission, which had had no prior contact with appellant, considered his application which was not acted upon until April 1978. Finally, appellant's exemplary conduct and rehabilitation at the NARA facility will most certainly be undercut by a probation revocation on his record. For these reasons, appellant was sufficiently prejudiced to warrant reversal.

The facts of this case also reveal a breakdown of communication between the District of Columbia Department of Probation and the Superior Court. It is imperative that the court be kept informed "of the circumstances and conduct of probationers." [9]

*Reversed.*

8. Both in appellee's brief and oral argument the "principled basis" asserted for the delay in holding the revocation of probation hearing was a "wait and see" attitude on the part of the court to better evaluate the adjustments made during the intervening sentence. *See Moody v. Daggert,* 429 U.S. 78, 89, 97 S.Ct. 274, 279, 50 L.Ed.2d 236 (1976). It is argued that due to the predictive nature of the revocation hearing to determine "the ability of the individual to live in society without committing anti-social acts," *Morrissey v. Brewer,* 408 U.S. 471, 480, 92 S.Ct. 2593, 2599, 33 L.Ed.2d 484 (1972), the trial court of necessity must delay. This argument fails in light of the exemplary report from the NARA authorities on appellant's rehabilitation and the frustration of the NARA aftercare

scheme produced thereby. This reasoning cannot supply the principled basis for the decision to revoke probation.

9. D.C.Code 1973, § 24–103, states:

The probation officers shall carefully investigate all cases referred to them by the court, and make recommendations to the court to enable it to decide whether the defendant ought to be placed under probation, and shall report to the court, from time to time as may be required by it, touching all cases in their care, to the end that the court may be at all times fully informed of the circumstances and conduct of probationers.