*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 23-CO-0011

SHAWN HENNY, APPELLANT,

V.

UNITED STATES, APPELLEE.

Appeal from the Superior Court
of the District of Columbia
(1993-FEL-004073)

(Hon. J. Michael Ryan, Trial Judge)

(Argued February 6, 2024            Decided August 29, 2024)

*Braeshaun Dozier*, with whom *Clayton S. Wild*, *Yishai Schwartz*, *Paul Brachman*, *Justin Anderson*, and *Justin Lerer* were on the briefs, for appellant. After argument, this court granted *Yishai Schwartz*'s motion to withdraw as counsel.

*Anne Y. Park,* Assistant United States Attorney, with whom *Matthew M. Graves*, United States Attorney, and *Chrisellen R. Kolb*, *Nicholas P. Coleman*, and *Eliot A. Folsom*, Assistant United States Attorneys, were on the brief, for appellee.

Before EASTERLY, DEAHL, and SHANKER, *Associate Judges*.

DEAHL, *Associate Judge*: Shawn Henny committed a first-degree murder in 1991, when he was twenty-one years old, for which he was sentenced to a lifetime in prison. Having spent more than three decades imprisoned for an offense he

committed in his relative youth, Henny is now eligible for a sentence reduction under the Incarceration Reduction Amendment Act, and he thus moved for IRAA resentencing. Beyond mere eligibility, an inmate seeking IRAA relief must demonstrate that they are no longer a danger to the community and that the interests of justice warrant a sentence reduction. The trial court denied Henny's request for a sentence reduction after holding an evidentiary hearing and considering all of the relevant IRAA factors. *See* D.C. Code § 24-403.03(c)(1-11). While it found that a number of factors favored a sentence reduction, one overriding consideration precluded it from finding that Henny was non-dangerous: his disciplinary record while imprisoned.

We vacate and remand the case for further consideration because the trial court did not account for powerful expert evidence that Henny's disciplinary history was a point in his favor. Henny presented expert evidence from a former Bureau of Prisons warden, Maureen Baird, who opined that "Henny appears to have more than substantially complied with the rules of the BOP institutions in which he has been housed." She explained that most of his disciplinary infractions were "from more than 20 years ago," and that they were not the type of infractions "indicative of a violent individual," but were instead more "nuisance type violations." She testified it was exceedingly rare for an inmate serving a life sentence to be moved to a medium-security facility—"maybe one out of hundreds," in her estimation—as

Henny had been. Given the arcana of BOP disciplinary infractions and security assessments, Baird's unrebutted expert testimony interpreting Henny's disciplinary history seems to be quite powerful. Yet the trial court did not expressly consider Baird's testimony in its findings, so we are left without any clear indication as to why the court seemed to discount it. While any dangerousness assessment is ultimately for the court (it need not credit the expert), we cannot uphold the trial court's finding absent some explanation for why it seemingly discounted Baird's unrebutted opinions.

We therefore vacate and remand the case for the trial court to consider and expressly address Baird's testimony as it relates to interpreting Henny's disciplinary record. We reject the remainder of Henny's arguments, for the reasons set forth below.

## I. Facts

Shawn Henny was convicted of first-degree murder for the 1991 killing of Brett Entsmiger. As this court described it in Henny's direct appeal, Henny was involved in an "elaborate drug-trafficking operation," and he suspected Entsmiger (an associate) was cooperating with law enforcement to take his operation down. So on Halloween night of 1991, Henny and his friend Michael Jenkins went with Entsmiger to a "crack house" on the pretense of picking up some drugs. Henny and

Jenkins then walked Entsmiger out to a wooded area behind the house and fired six bullets into him, killing him (it is unclear which of the two men fired the shots). Both Henny and Jenkins were convicted of first-degree murder and a host of related offenses. While that case was being investigated and prosecuted, Henny committed another "narcotic-related" murder in Virginia about a year later, when he was twenty-two years old. Henny served his Virginia sentence from 1993 through 2014, at which point he was paroled and transferred to BOP custody to begin serving his sentence for killing Entsmiger.

*The IRAA submissions and Henny's testimony*

Henny moved to reduce his remaining sentence under the District's IRAA. *See* D.C. Code § 24-403.03.[1] IRAA requires a trial court to "reduce a term of imprisonment" for an eligible defendant if they are no longer "a danger to the safety of any person or the community" and "the interests of justice warrant a sentence

---

[1] The government concedes that Henny is eligible for IRAA relief because his offenses were "committed before [his] 25th birthday" and he "has served at least 15 years in prison." D.C. Code § 24-403.03(a)(1). The government notes that it might have argued that Henny is not in fact eligible for relief because he has not served 15 years in prison under the particular sentence that he is now seeking to reduce—he only began serving his sentence for the 1991 offenses in the District in 2014, after decades in Virginia state prison. But it ultimately disavows that argument for purposes of this case because it did not make it before the trial court. Without resolving the broader legal issue, in this case it is conceded that Henny is eligible for IRAA relief.

modification." D.C. Code § 24-403.03(a)(2). In assessing those questions, the trial judge must consider ten statutory factors, plus an eleventh catch-all factor accounting for "[a]ny other information the court deems relevant." D.C. Code § 24-403.03(c)(1-11). We do not need to go into great detail about the bulk of the evidence before the trial court. Suffice it to say that the trial court concluded that several of the IRAA factors favored Henny's release—a few were immaterial—but that there was one overriding basis (affecting two statutory factors) for denying relief, as we now explain.

After receiving the written submissions and evidence, the trial court opened the evidentiary hearing by noting that its "biggest concerns" related to Henny's disciplinary record while imprisoned. The court acknowledged that interpreting prison disciplinary records is "one of the most difficult things about these IRAA proceedings," given the "paucity of information that's generally presented about things like these disciplinary issues." And it highlighted two infractions in particular—(1) a 2016 infraction for possessing a shank, and (2) a 2021 infraction for fighting with his cellmate—as raising serious concerns that Henny remained a danger to society. After saying those disciplinary infractions were its "chief concerns," the court invited the parties to "address them" through their in-court presentations and evidence.

Henny testified first. Most of his testimony was dedicated to explaining the 2016 and 2021 disciplinary infractions. As for the shank found on him in 2016, he said that he was on his way to referee a basketball game for one of the prison's units that had a fight break out earlier in the day, so "the tension was high on the compound" and he brought a shank "only for protection." As for the 2021 incident, Henny explained (and it is undisputed) that minutes before the fight, he had pressed the duress button in his cell so that he could be separated from his cellmate. Henny—who was then in his fifties—had noticed his cellmate "walking back and forth pacing in his cell," and that was "a red flag" that "something was wrong." Henny's cellmate did not have the paperwork that other prisoners expect to see within the month of their arrival at a new prison "showing you didn't cooperate or you're not like a child molester or a rapist." And because his cellmate's month was up, Henny surmised that he was looking to pick a fight with him so that he could be put in segregation housing to avoid the repercussions. While the guards removed Henny from his cell in response to his duress call for about fifteen minutes, he was then returned to his cell where he and his cellmate immediately began fighting. Roughly contemporaneous reports from BOP staff did not clearly indicate which, if either man, instigated the fight.

Henny's brother, John, also testified briefly. John's testimony largely related to Henny's reentry plan, including that Henny was going to stay in a house that John

owned (and where their mother lived), and that Henny had a concrete offer to work in a barbershop.

The only other witness to testify was Henny's expert, Maureen Baird, who had also submitted an expert report before the hearing. The evidence from her report and testimony is pivotal in this appeal, so we discuss it in some detail.

*Baird's report and testimony*

Henny presented the report and testimony of former BOP warden Maureen Baird to put his disciplinary record into context. Baird had spent twenty-seven years employed with BOP, and for stretches of that time her responsibilities included making parole recommendations and security-classification decisions for federal inmates. She was qualified "as an expert in interpreting BOP security classifications," "interpreting inmate discipline," and "deciphering . . . disciplinary reports."

Baird explained that the vast majority of Henny's disciplinary infractions came during his first years in Virginia state prison: thirty-six of Henny's forty-six infractions were from 1994 to 2000, and he then accumulated only ten more over the subsequent twenty-two years. She said that even during those first several years when Henny accrued the majority of his infractions, his record was unremarkable.

She explained that young men sentenced to life in prison often have "no hope for any type of release," and accumulate a lot of infractions early on. Baird also explained that Henny had never been sanctioned for any "violent, threatening, or egregious behavior" during his decades in Virginia state prison. Nineteen of Henny's Virginia infractions were for "disobeying an order," and his most serious offense came in 2000, when he was found to be under the influence of an intoxicating substance. That was the only one of Henny's Virginia infractions that would rise above what the BOP classifies as a "300-level moderate-severity" offense. Baird concluded that Henny's Virginia disciplinary record was "not spotless," but also "not indicative of a violent individual or of someone who possesses an aggressive nature."

As for Henny's more recent stint in BOP custody dating back to 2014, Baird opined that Henny "more than substantially complied with the rules of the BOP institutions in which he has been housed" and that his "behavior in prison is not indicative of being a threat to the community." She explained that Henny had just five infractions in his eight-plus years in BOP custody, which she described as a "minimal number," given that "offenders serving lengthy prison terms in penitentiaries usually have many more incident reports than the five attributed to Mr. Henny" during that stretch. Three of those five infractions were for what she

described as "nuisance type" offenses: disobeying an order in 2014, being in an unauthorized area that same year, and refusing a work assignment in 2018.

While two of Henny's BOP infractions were more serious—possession of a shank in 2016, and fighting with his cellmate in 2021—Baird opined that they too were not of any serious concern in light of the balance of Henny's record. She noted that the mere possession of a prison shank was "commonplace" at the particularly dangerous prison where Henny was housed at the time, where prisoners often had weapons "to protect themselves against real or perceived threats from predatory inmates." Henny's records showed that he had never been sanctioned for using, brandishing, or threatening to use a weapon. And as to the 2021 incident, she explained that there was a peak in cellmates fighting in 2021—COVID-19 lockdown orders meant that inmates were getting less time outside, and spending more time cooped up with their cellmates. Baird also believed that Henny's explanation for the 2021 altercation with his cellmate rang true. She explained that it was a "pretty common" tactic for inmates to pick fights in order to get put into segregated housing when they did not have the "paperwork" that other inmates expected to see.

And Baird explained that the BOP itself clearly did not view Henny as a danger even after that 2021 incident. She noted that prison staff suspended Henny's sanction for the 2021 fight, which meant they did not view it as a particularly serious

infraction. Henny had also long served as a referee for prison sporting events, including "softball, basketball, volleyball, football, and soccer games." Baird explained that those referees were "hand chosen" by prison staff because "[i]t is necessary for referees to have a calm and non-confrontational demeanor since their decisions at times result in heated debates amongst confrontational team players." Henny's years as a referee both indicated that "BOP staff must possess a level of trust for Mr. Henny" and showed "the respect Mr. Henny has from the inmate population."[2]

Most notably, just four months after Henny's 2021 altercation with his cellmate, Henny's case manager recommended that he be transferred to a medium-security facility, and that transfer appears to have gone through.[3] Baird explained that such a transfer was aberrational for an inmate serving a life sentence. She had spent two years herself as "the person that actually made those decision[s]" about lowering an inmate's security classification within the BOP. In those years,

---

[2] The potential for violence during those competitions also informed Henny's 2016 infraction for possessing a shank, in Baird's view. At the time, Henny was on his way to referee a basketball game, where refs often draw the ire of competitors.

[3] Baird's own testimony was unclear about whether the transfer had gone through, but Henny testified without rebuttal that by the time of his testimony, he had been moved to a "lower security" prison—from a United States Penitentiary to a Federal Correctional Institution.

she had seen "*maybe one*" inmate serving a life sentence transferred to a medium-security prison, and that was "out of hundreds of transfers."

Baird ultimately opined—in light of Henny's entire disciplinary record and history—that Henny had substantially complied with prison rules, was not a danger in the prison setting, and did not pose a danger to the community. If Baird "were making a decision on halfway house or release as a warden," she concluded that Henny "would be somebody" she "would take the chance on."

The government did not present any witnesses at the hearing, but it echoed the trial court's sentiments that Henny had a long and concerning track record of disciplinary infractions during his decades in prison. The government did not directly respond to the thrust of Baird's testimony either in its written pleadings or in its oral presentation, nor did it present any rebuttal evidence or expert testimony. As Henny fairly put it before the trial court, the government "fail[ed] entirely to rebut or even mention the findings of expert witness Maureen Baird."

*The trial court's ruling*

The court denied Henny's request for IRAA relief, concluding that his 2016 and 2021 disciplinary infractions overwhelmed any factors favoring release.

To put the court's ruling in terms of the eleven IRAA factors, the court reasoned that Henny's disciplinary history meant that he had not "substantially complied with the rules of the institution[s]" where he was confined, and had not "demonstrated maturity, rehabilitation, and a fitness to reenter society" (factors three and five, respectively). *See* D.C. Code § 24-403.03(c)(3), (5). The court noted—also relevant to these third and fifth factors—that Henny had "completed an impressive 900[-plus] hours in educational and vocational programming," and that he had "served as a mentor to other inmates and has been a positive influence on his friends and family." But it nonetheless found that, on balance, those third and fifth IRAA factors weighed against relief. *Id.*[4] The court counted a host of other IRAA factors in Henny's favor, including his "age at the time of the offense," his "history and characteristics," his "sympathetic background," and his diminished culpability

---

[4] The court seemed to count only one other statutory factor against Henny's release, but in doing so the court mistakenly applied an outdated version of IRAA. Specifically, the ninth IRAA factor had once asked "whether and to what extent *an adult* was involved in the [underlying] offense," D.C. Code § 24-403.03(c)(9) (repealed 2021) (emphasis added), and the trial court counted that as a factor against Henny's release because there was no evidence that any of Henny's accomplices in Entsmiger's murder were adults. But IRAA had been revised in 2021—prior to the proceedings here—so that this ninth factor directs the court to consider "to what extent *another person* was involved in the offense," regardless of whether they were an adult. D.C. Law 23-274 (Apr. 27, 2021) (emphasis added). We will leave the trial court on remand to reassess that factor under the current IRAA, but note that Henny had an accomplice who may have been the lone shooter.

as a youth (factors one, two, eight, and ten respectively).[5] *Id.* § 24-403.03(c)(1), (2), (8), (10). But it found that all of those factors favoring release were again outweighed by the "recent, serious [disciplinary] infractions from 2021 and 2016."

In denying IRAA relief, the court did not mention Baird's testimony. Her name appeared only in the opening paragraph of the court's written ruling to note that she had testified. Henny now appeals, arguing that the trial court abused its discretion when it denied IRAA relief.

## II. Analysis

"We review the denial of an IRAA motion for abuse of discretion." *Bishop v. United States*, 310 A.3d 629, 641 (D.C. 2024). In doing that, we must determine, among other things, "whether the decision maker failed to consider a relevant factor" or "relied upon an improper factor." *Id.* (quoting *Crater v. Oliver*, 201 A.3d 582, 584 (D.C. 2019)). Henny's first and strongest argument is that the trial court abused its discretion when it failed to expressly consider Baird's expert testimony when

---

[5] The court also found that some of the factors did not cut one way or the other. For instance, the sixth factor regarding victim impact statements (there were none), and the eleventh catch-all factor (the court opined that the ten delineated factors captured the relevant considerations). *Id.* § 24-403.03(c)(6), (11).

denying his request for IRAA relief. We first explain why we agree with Henny on that point and therefore vacate the trial court's order and remand the case for further consideration. We then explain why we reject the remainder of Henny's arguments.

## A.  The Trial Court Failed to Address Baird's Testimony

A trial court's findings must be "detailed enough to allow a reviewing court to conclude that the decision 'followed rationally' from the findings of fact." *In re T.W.M.*, 18 A.3d 815, 819 (D.C. 2011) (quoting *In re I.B.*, 631 A.2d 1225, 1232 (D.C. 1993)). While the trial court is "not required to inventory all the evidence and explain how [it] weighed each evidentiary item," *id.* (quoting *In re I.B.*, 631 A.2d at 1232), it is an abuse of the court's discretion if its "stated reasons [for ruling] do not rest upon a specific factual predicate," *Johnson v. United States*, 398 A.2d 354, 364 (D.C. 1979). That is, we must be able to discern what the trial court's basis for ruling was—including its basis for rejecting evidence that is central to the issues before it—otherwise we cannot "determine whether the decision-maker's choice was both reasonable and proper in the specific factual context" of the case. *Id.*

Here, we cannot meaningfully review the trial court's ruling absent some explanation for why it seemingly rejected Baird's testimony that Henny had "more than substantially complied with the rules of the BOP institutions in which he has been housed." We agree with the trial court's broad sense that deciphering the

arcana of prison disciplinary records is one of the more difficult tasks in IRAA cases. The government can pretty routinely point to dozens of disciplinary infractions when they oppose release for inmates who have spent decades in prison. But it is tough to know in the abstract what counts as substantial compliance with the institutional rules. As the court here aptly put it, there is usually "a paucity of information that's generally presented" to elucidate those records. But this case is the rare exception to that rule, where Baird's report and testimony appear to offer compelling, comprehensive, and unrebutted context for interpreting Henny's disciplinary record as a factor in favor of his release.

In Baird's expert accounting, Henny's disciplinary history—at least after the initial adjustment period ending in 2000—was close to exemplary. She highlighted the fact that he was the exceedingly rare prisoner serving a life sentence who had been transferred to a medium-security facility, which happened shortly after the 2021 disciplinary infraction that the trial court found most concerning. And she highlighted that Henny had never been sanctioned for any violent or threatening conduct during his decades in prison outside of that 2021 fight with his cellmate, and even that sanction was suspended, demonstrating that BOP staff did not view Henny's role in the scuffle to be all that serious. We simply cannot tell what the trial court's reasons were for parting ways with Baird.

This case is similar to *DeVeau v. United States*, 483 A.2d 307, 309-11 (D.C. 1984). That case involved a mental patient who had killed her daughter, but was acquitted by reason of insanity, and she sought conditional release from St. Elizabeths Hospital. The question for the trial court when considering release, similar to the baseline IRAA inquiry, was whether the patient "will or will not, in the reasonable future, be dangerous." *Id.* at 311. DeVeau presented the expert testimony of three psychiatrists who unanimously agreed that she did not pose a danger. *Id.* at 316. But "[d]espite this unanimity, the trial court . . . denied the request for release," noting that it had considered "the written reports and oral testimony of three psychiatrists," but it offered no explanation for why it rejected them. *Id.* at 310-11, 313. This court remanded the case for further consideration, explaining that while the trial court was not bound to accept the unrebutted expert testimony, it likewise could "not arbitrarily disregard such testimony." *Id.* at 315 (citing *United States v. McNeil*, 434 F.2d 502, 514-15 (D.C. Cir. 1970) (Bazelon, J., concurring) (per curiam)). Absent some direct explanation for why the court disagreed with the expert testimony, the record left us unconvinced that the "court adequately addressed all of the relevant evidence before it." *Id.* at 316.

We reach the same conclusion here, and highlight four factors that further animate our decision to remand for the trial court to directly address Baird's testimony.

First, Baird's testimony spoke to what the trial court viewed as the central issue in the IRAA proceedings—how to interpret Henny's disciplinary records. Baird's testimony was simply too critical to the dispositive issues underlying the trial court's IRAA ruling for the trial court to have left it unaddressed. *See P.F. v. N.C.*, 953 A.2d 1107, 1113 (D.C. 2008) ("Where the issue is a critical one, trial judges must explicate their reasoning in considerable detail.").

Second, Henny had stressed before the trial court that Baird's report was the most critical piece of evidence speaking to that issue, with his counsel (1) asking the court to "place great weight on" Baird's opinions, (2) spending a large chunk of their closing arguments dedicated to Baird's testimony, and (3) emphasizing that the government had entirely failed to address Baird's expert opinions. *See Negretti v. Negretti*, 621 A.2d 388, 390 & n.7 (D.C. 1993) (remanding because "the trial court did not address [important] testimony or its effect (if any) on the court's determination," and when appellant highlighted that the testimony had gone unaddressed, the court still did not address it).

Third, Baird's testimony was generally unrebutted. The government is well positioned to offer its own expert evidence on how to interpret disciplinary records, but it chose not to call any rebuttal expert, and it did not cast serious doubt on Baird's conclusions; it largely ignored them, without directly addressing them at all.

"Ordinarily, positive testimony which is not inherently improbable, inconsistent, contradicted, or discredited cannot be disregarded or ignored by judge or jury." *Belcon Inc. v. D.C. Water & Sewer Auth.*, 826 A.2d 380, 386 (D.C. 2003) (quoting *Perlman v. Chal-Bro., Inc.*, 43 A.2d 755, 756 (D.C. 1945)); *see also id.* at 383 ("[T]he Board must not reject uncontradicted evidence submitted by any party without explaining on the record, and in reasonable detail, why it has done so."); *Hamilton v. Hojeij Branded Food, Inc.*, 41 A.3d 464, 477 (D.C. 2012) (holding that factfinder's order "cannot stand" because it "failed to include adequately in [their] calculus [the] uncontradicted testimony, and the documentary evidence supporting that testimony").[6]

Fourth, it is not obvious to us whether the trial court generally credited Baird's testimony and simply found that it was outweighed by the raw facts of the disciplinary infractions, or if instead the court discredited her testimony for some

---

[6] Both *Belcon* and *Hamilton* concerned review of agency actions, and we are more likely to remand for further factual findings in that context than the present one. But those cases remain informative, as we have explained that the test for determining whether a trial court has abused its discretion is "[i]n many respects . . . comparable to the 'substantial evidence' test of the record in the judicial review of an administrative action." *Johnson*, 398 A.2d at 364 (quotation omitted); *id.* ("In both the judicial and administrative spheres the requirement that the decision-maker compile a record makes certain that the facts of the case do not escape his attention and makes it more probable that the decision-maker will exercise his discretion in a proper manner.").

reason.     The difference between those two analytical paths might affect our assessment of whether the court abused its discretion. *See Murphy v. Murphy*, 46 A.3d 1093, 1099-1100 (D.C. 2012) (remanding where we could not "meaningfully review the court's decision" because we could "not know whether the judge simply did not credit appellant's testimony or thought it was insufficient without independent corroboration"); *Negretti*, 621 A.2d at 390 (remanding because "we cannot fairly assess whether this was an abuse of discretion" where we could not "readily ascertain" the court's reasoning).[7]

The government counters that the trial court "was under no obligation to accept the expert's opinion," and that the trial court "implicitly rejected Baird's opinion regarding Henny's dangerousness" because it held he remained a danger.

---

[7] One collateral benefit of a remand is that the trial court can correct for two apparent missteps it made when considering the IRAA factors that Baird's testimony did not pertain to. As we explained in footnote four, in considering the ninth IRAA factor the trial court erroneously applied an outdated version of the statute, which led it to count that factor against Henny's release; under the applicable statute as amended in 2021, that factor appears to cut in Henny's favor. Also, the trial court seemed to be of the view that it could not take into account the underlying nature of Henny's offenses when assessing his dangerousness, given that IRAA had once directed trial courts to consider "the nature of the offense," but IRAA was later amended to remove that express consideration. After the trial court's ruling, this court clarified that trial courts can still consider "the nature of the underlying crime[s]" as part of the "interests of justice" calculus, though we cautioned against putting too much reliance on that factor in light of IRAA's overarching purposes. *Bishop*, 310 A.3d at 649.

We certainly agree that the trial court was under no obligation to accept Baird's testimony. *McNeil*, 434 F.2d at 504 ("The weight to be given any expert opinion admitted in evidence . . . is exclusively for the [factfinder]." (quoting *Jenkins v. United States*, 307 F.2d 637, 646 (D.C. Cir. 1962))). But even if we could further conclude that the trial court implicitly rejected Baird's testimony, we view that testimony as so critical to the issues before us that we need to understand the trial court's reasons for doing so before we can meaningfully review its ruling. The trial court's "failure to make sufficient findings—including findings on the weight given to [an expert]'s testimony"—can itself be "error [that] requires a remand." *A.C. v. N.W.*, 160 A.3d 509, 518 n.13 (D.C. 2017).[8] And here, given the seeming importance of Baird's testimony to the trial court's central concern, we lack "sufficient detail to permit appellate review" without some explanation as to why the court rejected Baird's findings. *Long v. United States*, 312 A.3d 1247, 1270 (D.C. 2024) (quoting *Cruz v. United States*, 165 A.3d 290, 294 (D.C. 2017)).

---

[8] *A.C.* and *Murphy* both relied upon Superior Court Domestic Relations Rule 52(a), which states that "the court must make written findings of fact and separate conclusions of law." *See* 160 A.3d at 520; 46 A.3d at 1099. IRAA contains a similar mandate, that "[t]he court shall issue an opinion in writing stating the reasons for granting or denying the application under this section." D.C. Code § 24-403(b)(4).

## B. Henny's Remaining Claims Lack Merit

We can make shorter work of the balance of Henny's claims, none of which has merit. He first argues (1) that the trial court "erred by not considering Mr. Henny's explanations for the" 2016 and 2021 disciplinary infractions. He next raises three procedural complaints that he never voiced before the trial court, namely, (2) that the trial court did not allow him to present his entire case, (3) that the trial court erred when, during Henny's remote testimony, it pressed forward despite apparent technical difficulties that made Henny inaudible, and (4) that the trial court erred in allowing the government to cross-examine Henny because IRAA did not give it any right to do that. We begin with the first point, and then consider the procedural complaints collectively.

### 1. *The court considered Henny's explanations for the 2016 and 2021 incidents*

Henny asserts that the court impermissibly ignored his testimony that his cellmate was the first aggressor in the 2021 disciplinary incident, and further ignored his stated reasons for carrying a shank in 2016. We disagree. The court considered Henny's testimony about the 2021 incident and simply did not credit it, and it explained why that was. The court had before it a "discipline hearing officers report" that provided a roughly contemporaneous narrative of what happened during that 2021 incident. And while that narrative supported much of Henny's account—

including that Henny pressed the duress button and was removed from his cell mere minutes before the fight—it also noted that upon Henny's return to his cell, he "immediately fought with" his cellmate. There was no mention of his cellmate instigating the fight, and we think the trial court accurately captured that the contemporaneous narrative was "less consistent with Mr. Henny being an innocent participant than with him being at least a co-aggressor." And as to the 2016 incident, the court acknowledged and seemed to credit Henny's account that he had the shank for "self-defense," and simply concluded that nonetheless still "raise[d] significant concern."

In sum, the court addressed Henny's testimony regarding the 2016 and 2021 disciplinary incidents. It simply did not fully credit Henny's testimony about the 2021 affray in light of the contemporaneous disciplinary records, which was well within the trial court's authority.[9] *Parker v. United States*, 254 A.3d 1138, 1150 (D.C. 2021) ("Where, as here, a trial judge presided over [a] factfinding hearing and

---

[9] Henny also complains that the court disregarded Baird's testimony that Henny's explanation for the 2021 assault rang true. The court was free to disregard that aspect of Baird's testimony, because "one witness may not express a view or an opinion on the ultimate credibility of another witness." *Allen v. United States*, 837 A.2d 917, 919 (D.C. 2003) (quoting *Carter v. United States*, 475 A.2d 1118, 1126 (D.C. 1984)). So while Baird's testimony provided some support for thinking Henny's account of the 2021 assault was plausible, her own apparent view that Henny was telling the truth was not competent or relevant evidence.

was able to observe and assess the demeanor of the witnesses, we take care to avoid usurp[ing] the prerogative of the judge, as the trier of fact, to determine credibility and weigh the evidence." (internal quotation marks and citations omitted)). And while the court did not seem to doubt that Henny had a shank in 2016 for self-defense purposes, there was nothing unreasonable about the court remaining concerned about that.

### 2. Henny's procedural challenges are meritless

Henny next complains about three procedural issues. The first two of these issues stem from what Henny claims was a rushed IRAA hearing that began at 2:48 pm with the trial court announcing (and later reiterating) that it had to conclude for the day by 4:45 pm. Because of the trial court's rush, Henny argues that (1) he was precluded from presenting one of his witnesses, Vanessa LeBlanc, and (2) the trial court pressed forward with Henny's remote testimony despite technical difficulties making him inaudible at times. These arguments are meritless because to the extent there was any error, Henny invited it. *Young v. United States*, 305 A.3d 402, 430 (D.C. 2023) ("[T]he invited error doctrine 'precludes a party from asserting as error on appeal a course that [they have] induced the trial court to take.'" (quoting *Preacher v. United States*, 934 A.2d 363, 368 (D.C. 2007))).

On the first issue, after Henny's final witness (his brother) testified, the court asked if he wished to present any "[f]urther evidence?" Henny said that he did not, with his counsel saying, "at this time, we'd like to make an attorney statement." That was Henny's choice and prerogative not to call any further witnesses. He now argues that it was not a true choice because the trial court "forced" him "to cut short his case to fit inside a roughly two-hour window." That is flatly unsupported by the record. While the trial court said that it had only two hours *that afternoon* to conduct the IRAA hearing, Henny was free to ask to continue the hearing to another day, but he never did so. It is obvious why he did not. Court calendars can be busy, and for all we know it may have taken some weeks or even months to get a second hearing date on the trial court's calendar. LeBlanc, Henny's cousin, was not a particularly important witness and she had already submitted a one-page letter summarizing her testimony: It was a character letter speaking to Henny's kindness, maturity, and growth while incarcerated. It was in fact one of dozens of character letters written in support of Henny by his friends, family, and fellow inmates, all admitted without objection. It is understandable why Henny would not want to delay the resolution of his IRAA motion purely for the sake of giving LeBlanc an opportunity to testify, and it would have been an overstep for the trial court to sua sponte foist an unwanted continuance upon him, at least absent a compelling reason for doing so. It was

Henny who made the choice not to call another witness, the trial court was right not to intrude on that decision, and we will not further scrutinize what Henny invited.

On the second issue, Henny complains that there were technical difficulties that made his testimony inaudible at times, and he suggests that the trial court should have suspended the IRAA hearing so that those issues could be fixed at a later date. While the record reflects that there were "audio distortions" during Henny's opening remarks, those issues appear to have been only momentary, and once Henny moved closer to the microphone on his computer things were "a lot better." Plus, at the time of the audio difficulties, Henny was reading from a prepared letter, and the court conscientiously asked Henny's counsel to submit the letter for the record to ensure that the court did not miss anything. We thus do not detect any serious technical difficulties that would have justified the trial court sua sponte continuing the hearing, and it once again would have been an overstep for the trial court to foist a continuance upon Henny where he plainly did not want one. Defense counsel clearly wished to proceed with the hearing despite the momentary technical difficulties. After Henny's opening remarks, his counsel advised him to "talk a little bit slower and take pauses between sentences so that the judge and prosecutor can understand you." After that instruction, nothing in the record suggests that there were any further technical difficulties.

Finally, Henny argues that the trial court reversibly erred by allowing the government to cross-examine him. Permitting the government to question an IRAA movant is anathema to the statute's purpose, Henny asserts, and "nothing in the statute contemplates that the defendant must be subject to cross-examination." We need not scrutinize this claim because if there were any error, Henny again invited it and so he cannot complain about it on appeal. *Young*, 305 A.3d at 430. At the start of his IRAA hearing, just before Henny's testimony, Henny's counsel told the court that "the government and the defense . . . agreed that cross-examination will come out of the time allotment assigned to the party questioning." Whether or not the government is entitled to cross-examine an IRAA movant, we have no doubt that an IRAA movant can submit to cross-examination if they wish—they might have reason to think the willingness to undergo such scrutiny will bolster their case. And here, that is exactly what Henny did, and the trial court was quite right not to intrude upon that decision.

## III. Conclusion

We vacate the court's order and remand the case for further proceedings so that the trial court can directly address Baird's expert testimony. Given how dynamic IRAA decisions can be, the trial court may wish to reopen the record to consider any late-breaking evidence, but we leave that to the trial court's discretion.

*So ordered.*