*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

## DISTRICT OF COLUMBIA COURT OF APPEALS

No. 24-CO-0294

GOLDIE DOBIE, APPELLANT,

v.

UNITED STATES, APPELLEE.

Appeal from the Superior Court
of the District of Columbia
(2001-FEL-006539)

(Jennifer M. Anderson, *Judge*)

(Argued November 5, 2025                    Decided May 28, 2026)

*Sarah McDonald*, Public Defender Service, with whom *Jaclyn S. Frankfurt* and *Shilpa S. Satoskar*, were on the briefs, for appellant.

*R. Alan Darby*, Assistant United States Attorney, for appellee. *Matthew M. Graves*, United States Attorney at the time the brief was filed, and *Chrisellen R. Kolb*, *Kristina Ament*, and *Amanda Claire Hoover*, Assistant United States Attorneys, were on the brief for appellee.

Before BLACKBURNE-RIGSBY, *Chief Judge*, SHANKER, *Associate Judge*, and WASHINGTON, *Senior Judge*.

WASHINGTON, *Senior Judge*: In this appeal, Goldie Dobie (appellant) argues that the trial court abused its discretion when it denied his motion for a reduction in sentence under the Incarceration Reduction Amendment Act (IRAA), D.C. Code

§ 24-403.03. He contends, among other things, that the trial court erred by relying too heavily on his juvenile criminal history when assessing his current dangerousness and concluding that a reduction in his sentence is unwarranted in the interest of justice because he committed and suborned perjury during a prior Innocence Protection Act proceeding, D.C. Code §§ 22-4131 to -4135. The government counters that the trial court did not err in considering appellant's juvenile history in tandem with other factors as part of its dangerousness determination and that the record supports the trial court's finding that a reduction in appellant's sentence is not in the interests of justice based on appellant's committing and suborning perjury in an earlier proceeding. For the following reasons, we vacate the trial court's order and remand the case for further consideration.[1]

## I.    Background

This court has considered multiple appeals from appellant related to his conviction for the September 8, 2000, shooting of Mallie Scott and Damon

---

[1] Appellant's Motion to Recaption this Case Using Appellant's Initials is DENIED.

McQuarters. Our Memorandum Opinion and Judgment disposing of his direct appeal laid out the relevant facts underlying his conviction:

> On September 8, 2000, Mallie Scott, Damon McQuarters, and Jovan Jackson were parked on the 3300 block of 11th Street N.W., when they were approached by three men. Scott knew these men as Dobie, Nook ("Jones"), and Kareem. While the conversation started friendly, at some point it took a sour turn when Jones told the occupants, "Why you keep riding through my block?" The conversation was interrupted when a station wagon stopped next to the parked car. Dobie, Jones, and Kareem exchanged "what's up" with the station wagon and brandished guns kept in the waistband of their pants. Sensing danger, Scott tried to exit the parking spot by making a U-turn. According to Scott, Jones then turned to Dobie and stated, "Go ahead what you're gonna do." Immediately, Dobie, Jones, and Kareem began to shoot into the car. Jackson, upon hearing the first gunshot, escaped unharmed from the vehicle.
>
> Between four to eight minutes later, Metropolitan Police Department Patrol Officer Gary Shrawder came to 11th Street and observed that McQuarters and Scott were both suffering from gunshot wounds. When he asked what happened, Scott responded, "Goldie Dobie shot me." Both Scott and McQuarters were transported to the Washington Hospital Center for treatment. Within two weeks of the shooting, McQuarters identified both Dobie and Jones as the shooters.

*Goldie Dobie & Antoine Jones v. United States* (*Dobie I*), Nos. 03-CF-0324 & 04-CF-1326, Mem. Op. & J. at 2 (D.C. Nov. 3, 2009) (citations omitted).

Appellant was convicted of assault with intent to kill while armed, D.C. Code § 22-501, and of two counts each of mayhem while armed, D.C. Code § 22-506; aggravated assault while armed (AAWA), D.C. Code § 22-504.1; possession of a firearm during a crime of violence (PFCV), D.C. Code § 22-3204(b); possession of an unregistered firearm, D.C. Code § 6-2311(a); unlawful possession of ammunition, D.C. Code § 6-2361(3); and carrying a pistol without a license, D.C. Code § 22-3204(a).[2] *Dobie I*, Mem. Op. & J. at 1. In 2009, in his direct appeal, we affirmed appellant's convictions, but held that the AAWA conviction should merge into the mayhem conviction, and that only one PFCV conviction could stand. *Id*. at 6.

Subsequently, in 2016, we affirmed the trial court's denial of appellant's motion attacking his conviction under D.C. Code § 23-110.[3] *See generally Goldie Dobie v. United States* (*Dobie II*), No. 15-CO-0159, Mem. Op. & J. (D.C. Jul. 1, 2016). Finally, prior to pursuing relief under the IRAA, appellant moved to vacate

_____

[2] Appellant was convicted under the 1981 version of the D.C. code. *Dobie I*, Mem. Op. & J. at 1 n.1. The charges listed relate to the code as charged in 1981 and do not reflect the 2001 recodification.

[3] We also remanded the case to vacate appellant's AAWA convictions and one of his PFCV convictions. *Id.* at 2.

his conviction under the Innocence Protection Act (IPA). The trial court denied his IPA motion and in a 2020 Memorandum Opinion and Judgment, we affirmed. *Dobie v. United States* (*Dobie III*), No. 18-CO-0680, Mem. Op. & J. at 2 (D.C. Apr. 23, 2020).

In the IPA proceedings, appellant presented new evidence: Mr. Scott's recantation of his identification of appellant as the shooter. *Id*. at 1. The trial court rejected his motion, finding that Mr. Scott's testimony was not credible. In affirming the trial court's denial of appellant's motion, we stated:

> In support of the motion, [appellant] submitted an affidavit asserting his innocence (i.e., that he "did not shoot or otherwise assault . . . Scott or anyone else on September 8, 2000 or at any other time") and the transcript and video from an October 3, 2016, videotaped deposition of Mr. Scott, who recanted his identification of appellant as the shooter.
>
> * * *
>
> The trial court did not credit Mr. Scott's recantation, finding "suspicious" his testimony that he does not know who shot him. The court also found that Mr. Scott's testimony at the IPA hearing and in his deposition "brimmed with inconsistencies." Further, the court found that Mr. Scott's demeanor was "remarkable" at both the hearing and the deposition; specifically, he "fidgeted rather nervously," was "sweating profusely," and appeared "inauthentic, nervous, and forced." The court found that there was also no evidence corroborating Mr. Scott's recantation (while his trial and grand jury testimony that appellant shot him was corroborated by

> Mr. McQuarter's testimony that appellant was one of the shooters and Officer Shrawder's testimony about what Mr. Scott told him on the scene ("Goldie Dobie shot me"), and was also consistent with Mr. Jackson's testimony that he heard Scott identify appellant as one of the three people who approached the parked car on the night of the incident). Finally, observing that the government "presented a strong case at trial," the court found that the jury "would have likely still convicted" appellant without Mr. Scott's testimony naming appellant as the shooter.

*Id.* at 3-4.

Thus, in that appeal, we concluded, as relevant here, that the record supported the trial court's finding that Mr. Scott's recantation was not credible. *Id.* at 6.

## A. Legal Background

As our prior decisions have made clear, the "[District of Columbia] Council initially passed the IRAA in response to several 'constitutional imperatives' declared by the Supreme Court in a series of cases holding that the Eighth Amendment prohibits sentences of life without parole for juvenile offenders." *Bishop v. United States*, 310 A.3d 629, 635 (D.C. 2024). "The IRAA provides for a second look at lengthy prison sentences for individuals convicted of offenses they committed before the age of twenty-five." *Id*. at 633. It offers juvenile offenders a "realistic, meaningful opportunity to obtain release based on their diminished culpability and

their maturation and rehabilitation." *Id.* at 634-35 (quoting *Williams v. United States*, 205 A.3d 837, 846 (D.C. 2019)).

The rationale behind both the Supreme Court decisions and the Council's legislative enactments is founded in the "body of scientific evidence demonstrating that the frontal lobes of the brain, which control executive functions like planning, working memory, and impulse control, may not be fully developed until the mid-twenties." *Id.* at 635 (citation modified); *see also Long v. United States*, 312 A.3d 1247, 1260 (D.C. 2024) ("The IRAA recognizes that eligible inmates are deserving of an opportunity to seek early release from their sentences because they were less developmentally culpable when they committed their crimes.").

"Pursuant to the IRAA, a trial court 'shall reduce a term of imprisonment imposed upon a defendant,' D.C. Code § 24-403.03(a), if the movant meets two sets of criteria: eligibility criteria and merits criteria." *Doe v. United States*, 333 A.3d 893, 899 (D.C. 2025). IRAA movants are eligible if they committed the offense at issue before turning twenty-five; were sentenced pursuant to Sections 24-403 or 24-403.01, or were committed pursuant to Section 24-903; and served fifteen or more years in prison. D.C. Code § 24-403.03(a). If the movant satisfies the eligibility criteria, the court proceeds to a merits determination based on the criteria listed in Section 24-403.03(a)(2). *Id.*; *see also Doe*, 333 A.3d at 899. Under the Act, courts

have to reduce the term of imprisonment if they "find[], after considering the factors set forth in subsection (c) of this section, that the defendant is not a danger to the safety of any person or the community and that the interests of justice warrant a sentence modification." D.C. Code § 24-403.03(a)(2). The factors trial courts "shall consider" while making the dangerousness and interests of justice determinations are:

(1) The defendant's age at the time of the offense;

(2) The history and characteristics of the defendant;

(3) Whether the defendant has substantially complied with the rules of the institution to which the defendant has been confined, and whether the defendant has completed any educational, vocational, or other program, where available;

(4) Any report or recommendation received from the United States Attorney;

(5) Whether the defendant has demonstrated maturity, rehabilitation, and a fitness to reenter society sufficient to justify a sentence reduction;

(6) Any statement, provided orally or in writing, provided pursuant to § 23-1904 or 18 U.S.C. § 3771 by a victim of the offense for which the defendant is imprisoned, or by a family member of the victim if the victim is deceased;

(7) Any reports of physical, mental, or psychiatric examinations of the defendant conducted by licensed health care professionals;

(8) The defendant's family and community circumstances at the time of the offense, including any history of

abuse, trauma, or involvement in the child welfare system;

(9) The extent of the defendant's role in the offense and whether and to what extent another person was involved in the offense;

(10) The diminished culpability of juveniles and persons under age 25, as compared to that of older adults, and the hallmark features of youth, including immaturity, impetuosity, and failure to appreciate risks and consequences, which counsel against sentencing them to lengthy terms in prison, despite the brutality or cold-blooded nature of any particular crime, and the defendant's personal circumstances that support an aging out of crime; and

(11) Any other information the court deems relevant to its decision.

*Id.* § 24-403.03(c).

The movant bears the burden of proof, which is a preponderance-of-the-evidence standard. *Doe*, 333 A.3d at 900 & n.6 (quoting *Bishop*, 310 A.3d at 636).

## II.    Discussion

This court reviews denials of IRAA motions for abuse of discretion, "but consider[s] questions of statutory construction de novo. In reviewing for abuse of discretion, we 'must determine whether the decision maker failed to consider a relevant factor, whether [the decision maker] relied upon an improper factor, and

whether the reasons given reasonably support the conclusion.'" *Bishop*, 310 A.3d at 641 (alteration in original) (citation omitted) (quoting *Crater v. Oliver*, 201 A.3d 582, 584 (D.C. 2019)). "'Reversal likely is called for' when 'the trial court's decision is supported by improper reasons, reasons that are not founded in the record, or reasons which contravene the policies meant to guide the trial court's discretion.'" *Bryant v. United States*, 341 A.3d 586, 592 (D.C. 2025) (quoting *Johnson v. United States*, 398 A.2d 354, 367 (D.C. 1979)). This "court makes two distinct classes of inquiries when reviewing a trial court's exercise of discretion. It must determine, first, whether the exercise of discretion was in error and, if so, whether the impact of that error requires reversal." *Johnson*, 398 A.2d at 367. "A court by definition abuses its discretion when it makes an error of law." *Long*, 312 A.3d at 1269 (quoting *Vining v. District of Columbia*, 198 A.3d 738, 754 (D.C. 2018)).

With regard to the IRAA, trial courts also abuse their discretion when they fail to consider all relevant factors under the Act. *See Bryant*, 341 A.3d at 592. "Generally, on review for abuse of discretion, an argument that the trial court 'should have given more weight to [certain] factors . . . is not a basis for reversal.'" *Long*, 312 A.3d at 1271 (omission in original) (quoting *Sharps v. United States*, 246 A.3d 1141, 1159 n.90 (D.C. 2021)). However, "[a] trial court's failure to explain [] a

nonobvious exercise of discretion generally requires a remand, particularly when it prevents adequate appellate review of the basis of its holding." *Id.* at 1269.

As there is no dispute regarding appellant's eligibility for relief, we turn to the trial court's merits findings related to whether he remains a danger to the community and whether a reduction in his sentence would be in the interests of justice.

## A. Dangerousness Determination

In its ultimate finding that appellant remains a danger to the community, after considering the eleven statutorily required factors, the trial court focused much of its discussion on factor two, appellant's history and characteristics. The trial court also referenced its findings under factor three, whether appellant had substantially complied with the rules of the institutions in which he had been confined and whether appellant had completed any educational, vocational or other programs, and factor five, whether appellant had demonstrated maturity, rehabilitation, and a fitness to reenter society sufficient to justify a sentence reduction. However, with respect to its ultimate finding of dangerousness, the trial court focused most heavily on appellant's teenage interactions with the juvenile justice system.

While there is "nothing categorically wrong with the trial court taking one's teenage criminal history into some account," *Bryant*, 341 A.3d at 589, and the

IRAA's second factor does in fact allow for consideration of a movant's teenage criminal history, a trial court may not "isolate[] and weigh" defendants' criminal history so heavily that it "inverts the underlying logic of IRAA" such that it "risks rendering the statute ineffective." *Id.* at 597. For that reason, as we recently explained in *Bryant v. United States*, a trial court abuses its discretion when it "giv[es] excessive weight" to a defendant's teenage criminal history under factor two. *Id.* at 595, 597.

Appellant argues that the trial court's heavy reliance on his juvenile criminal record so dominated its consideration of appellant's dangerousness to the community that it ran afoul of our proscription in *Bryant* and amounted to an abuse of discretion. *See id*.

We agree with appellant's assertion. The trial court continuously references the history of appellant's juvenile criminal interactions throughout the trial court's order. In fact, the trial court included in its order a summary of every juvenile interaction appellant had with the criminal justice system prior to his convictions, even if the interaction did not result in a finding of delinquency. The trial court then concluded that:

> To be sure, [appellant] has some factors in his favor. But there are significant negatives. As discussed in connection

> with the second factor, [appellant] has a substantial juvenile criminal history. The Court is aware that the purpose of the IRAA is to give individuals who committed crimes during those early years a second opportunity. But the Court can't emphasize enough how unusual it is to see a defendant who starts in the juvenile system at such an early age. From the young age of 9 until now where [appellant] is 42 years old, [he] has spent much of his life detained in one form or another.

Such a consideration, in order to be consistent with the recognized purpose underlying the statute, would actually argue in favor of appellant's unusually young age, adding *more* mitigating weight to those offenses rather than undermining the force of appellant's argument that he is no longer a danger because his brain has now reached a point in its development that makes it significantly less likely that he would engage in such criminal endeavors. *See id.* at 596 ("We get the court's point— it didn't take Bryant long to amass a pretty substantial criminal history—but per IRAA's terms, the force of that point is substantially offset by the mitigating factors of youth."); *see also Bishop*, 310 A.3d at 635 (discussing the underlying rationale behind the IRAA: that the brain does not fully develop until one reaches their mid-twenties, which means that juveniles are overall less mature and able to understand responsibility); *Long*, 312 A.3d at 1259-60 (explaining that the IRAA is premised on scientific evidence that juveniles' brains are less developed and therefore they are less "developmentally culpable"). However here, instead of taking appellant's youth

when committing those offenses into consideration in its analysis and weighing it appropriately, the trial court's order heavily relies on appellant's juvenile criminal involvements to support its ultimate finding that appellant would continue to be a danger to the community if released early from prison.

We also warned in *Bryant* that "mere arrests are not to be taken as any proof of guilt in the IRAA calculus." *Bryant*, 341 A.3d at 597. Indeed, it is antithetical to the IRAA's purpose to find that juvenile *interactions* with the criminal justice system that did not result in a conviction would justify continued incarceration. *See id.*; *cf. Bradley v. District of Columbia*, 107 A.3d 586, 595 (D.C. 2015) ("No [sentencing] judge can make valid judgments without knowledge of the facts, and . . . fair administration of justice demands that the sentencing judge will not act on surmise, misinformation and suspicion.") (citation modified). Here, because the trial court relied on appellant's juvenile arrests along with his juvenile convictions to justify its ultimate finding that appellant remains a danger to the community, the order runs afoul of *Bryant* and requires reversal. *Bryant*, 341 A.3d at 596.

While the trial court abused its discretion by giving too much weight to appellant's juvenile criminal history, the trial court's dangerousness determination also raises other concerns. In its factor two analysis, the trial court appears to have credited the limited description of appellant's childhood in his Presentence Report

over the much more extensive background investigation that was submitted on his behalf by PDS in this litigation. While this kind of choice may be theoretically within the trial court's discretion, the trial court offered no "direct explanation for why [it] disagreed with" the mitigation report's portrayal of appellant's youth. *See Henny v. United States*, 321 A.3d 621, 630 (D.C. 2024) (holding that it was an abuse of discretion for the trial court to reject expert testimony addressing the IRAA movant's prison infractions without explaining why).

Relatedly, in its discussion of factor eight, the trial court concluded that "it does not appear that the Defendant suffered abuse or trauma at the hands of family members or others." But the mitigation report prepared by PDS contained specific allegations of trauma and abuse. The trial court did not address the allegation that appellant was sexually abused before he was five and again by another child when he was seven; the impact of the violent death of appellant's cousin when he was nine; the allegation of appellant's attempted suicide at age ten; and the allegations regarding his traumatic experiences in the juvenile detention system. This is all the more curious because the trial court "acknowledge[d] that [appellant] reports that he was 'largely abused, not disciplined' and reports 'male figures in his life disciplined him violently and sporadically,'" allegations contained in the Mitigation Report but not in the Presentence Report.

Further, while the trial court makes a general reference to the fact that the appellant has "some considerations that weigh in favor" of granting appellant's motion, those factors are not discussed nor referenced in the discussion of its ultimate finding of dangerousness. As such, it makes it especially difficult for this court to effectively review the trial court's exercise of its discretion. We recognize that trial courts are being called upon to perform an extremely difficult task, to somehow divine whether a young person who committed a very serious crime and has been incarcerated for more than twenty years remains a danger to a community. Given the centrality of certain evidence in the record that would seem to be important to that determination, evidence that may be as or more indicative of the forty-two year-old man appellant has become rather than the young person that he was at the time the crime was committed, the court's failure to discuss appellant's low PATTERN Score, one that reflects his low likelihood of recidivism, or the fact that he was given meaningful responsibility and held down significant employment while incarcerated, seems like a glaring omission when discussing the history and characteristics of the movant.

While it is not necessary to provide such detail when we can discern the trial court's reasoning from its written order, when the trial court refers generally to "factors that are in the [movant's] favor" or makes reference to appellant's

"continued propensity to disobey rules," without more, our review becomes more difficult. Here, for example, the basis for the trial court's determination that appellant's rules infractions are indicative of the kind of dangerousness that would put the community at risk is not at all clear. The trial court's findings under the third factor acknowledge that during the past twenty-plus years of appellant's incarceration, he has been cited for only two violent infractions. In one of those incidents, the other participant actually repudiated the claim that there had even been an altercation and, in the other incident, the trial court acknowledged that the infraction resulted from appellant being physically attacked by another inmate who had broken free from the control of a correction officer. Thus, he was not the instigator of physical violence. Further, and to the extent that the trial court is relying on his non-violent infractions as support for its finding that appellant has a "continued propensity to disobey rules," the trial court's own order notes that more than half of appellant's eighteen infractions occurred before his twenty-fifth birthday, meaning that the subsequent non-violent infractions amounted to less than one infraction for every two years of his incarceration between the ages of 25 and 42.

To be clear, we are not suggesting that there is some magic number of infractions that are needed to support a finding of dangerousness. However, to find

that such a low number of recent non-serious infractions qualifies appellant as a serial rule breaker, let alone a dangerous person, requires more than just a reference to the particular number of infractions divorced from context as to why those rules violations caused the court to find that appellant failed to meet his burden.

"Our standard of review . . . reflects that although we accord the trial court substantial 'latitude' in its exercise of discretion, this latitude comes with conditions[,]" including that the court "explain[s] its reasoning in sufficient detail to permit appellate review." *Cruz v. United States*, 165 A.3d 290, 294 (D.C. 2017) (quoting *Ibn-Tamas v. United States*, 407 A.2d 626, 635 (D.C. 1979)); *see also Henny*, 321 A.3d at 629 ("[W]e must be able to discern what the trial court's basis for ruling was—including its basis for rejecting evidence that is central to the issues before it—otherwise we cannot 'determine whether the decision-maker's choice was both reasonable and proper in the specific factual context' of the case." (quoting *Johnson*, 398 A.2d at 364)); *cf. Long*, 312 A.3d at 1269 ("A trial court's failure to explain such a nonobvious exercise of discretion generally requires a remand, particularly when it prevents adequate appellate review of the basis of its holding.") (remanding because the trial court did not explain whether it denied IRAA relief because it concluded the defendant had failed to meet his burden under either dangerousness, interests of justice, or both).

Because the trial court improperly relied on appellant's juvenile criminal history in violation of *Bryant* and otherwise failed to provide us with a record upon which we could effectively review its exercise of discretion in reaching its dangerousness determination, the trial court abused its discretion and the errors were not harmless.[4]

## B. Interests of Justice Determination

In determining whether appellant met his burden of proving that a reduction in his sentence was in the interests of justice, the trial court made a subsidiary finding that in a prior proceeding under the Innocence Protection Act (IPA), appellant "knowingly suborned perjury"; filed a "clearly [] false" motion thereby "maintaining his false claim of innocence"; and "put false evidence before the Court." The trial court found appellant's willingness to engage in such conduct to be indicative of a lack of maturity and fitness under the fifth factor and relied on that finding to support its ultimate determination that releasing appellant was not in the interests of justice.

---

[4] The government does not argue that the trial court's reliance on appellant's teenage interactions with the criminal justice system was harmless. *See (Marquette) Riley v. United States*, 338 A.3d 1, 10 (D.C. 2025) ("The government has not disputed that the above errors were harmful, and we therefore vacate and remand for reconsideration.").

More specifically, the trial court found that appellant "not only perjured himself in an affidavit under oath and suborned the perjury of an additional witness . . . , he pursued his motion through not only a ruling but an appeal." Interestingly, the trial court made that finding despite acknowledging in its general discussion during its consideration of the fifth factor that a defendant is not required to "accept responsibility or express remorse to qualify under the IRAA." Nonetheless, the trial court ultimately found that appellant's "recent," "deliberate" decisions to present "false testimony" of his innocence and pursue an appeal "preclude[d] a finding that [appellant's] early release [was] in the interests of justice."

Appellant argues that the trial court's conclusion lacks a foundation in the record, that its reliance on his claim of innocence conflicts with the IRAA's premise, and that the trial court was too attenuated from his IPA proceedings to make the necessary findings that he engaged in perjurious conduct. In response, the government argues that the record supports the trial court's conclusion, that the trial court did not err in its finding, and that the trial court's subsequent reliance on its finding supports its conclusion that reducing appellant's sentence was not in the interests of justice. The government argues in the alternative that even if the trial court erred, such an error was harmless because the IRAA's eleventh factor allows

for consideration of "[a]ny other information the court deems relevant to its decision." D.C. Code § 24-403.03(c)(11).

"[W]ith respect to charges of perjury, 'the requirements of proof are the strictest known to the law, outside of treason charges.'" *Wilson v. United States*, 194 A.3d 920, 922 (D.C. 2018) (cleaned up) (quoting *(Julian) Riley v. United States*, 647 A.2d 1165, 1174 (D.C. 1994)). At trial, the government must present evidence that a defendant made an actually false statement of material fact, under oath, with knowledge of falsity; this evidence must be corroborated by at least one witness as well as independent evidence (known as the "two-witness rule"). *Id.* This two-witness rule also applies to subornation of perjury. *Jenkins v. United States*, 500 A.2d 1019, 1021 (D.C. 1985). However, if a judge finds that a defendant "committed perjury during the trial, the judge is free to consider this in assessing [a defendant's] rehabilitative potential and, in general, as to what [their] punishment should be." *Brandon v. United States*, 553 A.2d 640, 644 n.9 (D.C. 1989).

Here, there was no direct evidence presented that appellant perjured himself or suborned perjury and that was not a finding made by the IPA court or this court on appeal. Moreover, even if the trial court could permissibly find that Mr. Scott's recantation was false, there is no evidence in this record that appellant knew that was the case. *See* D.C. Code § 22-2402(a)(1) (requiring that an offender have knowledge

of falsity so that he "does not believe [the perjurious statement] to be true"). Because there was insufficient evidence in the record for the trial court to make such a finding based on the record before the IPA court, the trial court erred. Given that the trial court's erroneous rationale so infected its conclusion, its error was not harmless.[5] *See, e.g., Bryant*, 341 A.3d at 598 (explaining that a remand was appropriate because this court was "not sufficiently confident that the trial court's errors did not affect its bottom-line judgment to deny Bryant relief"); *cf. Doe*, 333 A.3d at 912 (concluding that the trial court's errors were harmless).

More generally, while we do not suggest that statements and representations made by a defendant in other filings, including other petitions for post-conviction relief, cannot bear on the defendant's maturity and whether the interests of justice favor a sentence modification, we have significant reservations about a trial court's weighing of a defendant's filing for IPA relief and professions of innocence more

---

[5] We disagree with the government's argument that if the trial court erred in concluding that appellant committed and suborned perjury, it was harmless because that analysis is appropriate under the IRAA's eleventh factor. Regardless of whether that argument is correct, the trial court itself explained that it was appellant's actions in his IPA proceedings and corresponding appeal that "preclude[d] a finding that [his] early release [wa]s in the interests of justice." The trial court's error therefore cannot be parsed out from its ultimate conclusion about the interests of justice, and thus, was not harmless.

broadly against the defendant in the interests of justice analysis. As the trial court noted in its own consideration of appellant's maturation and rehabilitation in its factor five analysis, IRAA movants need not accept responsibility nor show remorse to "qualify under the IRAA." Indeed, the Council did not include demonstrating remorse as a factor for judicial consideration, unlike other states' comparator statutes. *See* Cal. Penal Code § 1170(d)(6)(F) (including whether movants have shown "evidence of remorse" as a factor courts may consider); Conn. Gen. Stat. § 54-125a(f)(4)(C) (requiring consideration of "whether such person has demonstrated remorse and increased maturity since the date of the commission of the crime . . ."); Fla. Stat. § 921.1402(6)(e) (mandating that courts consider "[w]hether the juvenile offender has shown sincere and sustained remorse for the criminal offense."). In light of these issues, the interests of justice determination should be reconsidered so that it rests on findings firmly supported by the record.[6]

---

[6] The trial court made another subsidiary finding in its interests of justice analysis: that appellant's "original sentence . . . fairly reflected the seriousness of the offense" and his criminal history. Although appellant does not challenge that portion of the order, because we are remanding this case to the trial court, we feel compelled, in the interest of completeness, to point out that "trial courts are not only required to analyze the eleven enumerated factors in the merits inquiry, but they are also limited to considering those factors." *(Marquette) Riley*, 338 A.3d 1, 8-9 (D.C. 2025); *see also Doe*, 333 A.3d at 907-08 ("[A] trial court is prohibited from considering the seriousness of a defendant's underlying offense in isolation pursuant to the catch-all

## III.    Conclusion

Because in making its dangerousness finding the trial court improperly relied on appellant's juvenile criminal contacts, made subsidiary findings of fact not supported by the record, and failed to fully explain how it exercised its discretion sufficient to allow for effective appellate review, and further, because the trial court's interests of justice determination was based on a misapprehension of the law, we vacate the trial court's order and remand this matter for further consideration consistent with this opinion and the Statute.

*So ordered*.

---

provision."). "'[J]ust punishment' is not a salient IRAA consideration because IRAA's 'very terms provide a framework for a significant reduction of a sentence that, according to the initial sentencing judge, fit the serious, heinous nature of the crime.'" *(Marquette) Riley*, 338 A.3d at 9-10 (cleaned up) (quoting *Doe*, 333 A.3d at 907).